**CELLULAR INFORMATION SYSTEMS, INC., a Delaware corporation, Plaintiff,**

v.

**Robert F. BROZ and RFB Cellular, Inc., a Delaware corporation, Defendants,**

and

**Mackinac Cellular Corp., Intervenor.**

**Civ. A. No. 14094.**

Court of Chancery of Delaware, New Castle County.

Submitted: May 5, 1995.
Decided: May 8, 1995.

---

Richard D. Allen, Kenneth J. Nachbar, and Karen L. Pascale, of Morris, Nichols, Arsht & Tunnell, Wilmington; of counsel: Paul Vizcarrondo, Jr., Theodore N. Mirvis, Meir Feder, and Marc Ashley, of Wachtell, Lipton, Rosen & Katz, New York City, for plaintiff.

Stephen C. Norman, and Michael A. Pittenger, of Potter Anderson & Corroon, Wilmington, of counsel: Michael J. Silverberg, and Theodore C. Max, of Phillips, Nizer, Benjamin, Krim & Ballon, New York City, for defendants.

Henry E. Gallagher, Jr., of Connolly, Bove, Lodge & Hutz, Wilmington, of counsel: Glenn D. Solomon, of Offit & Kurman, P.A., Owings Mills, MD, for Mackinac Cellular Corp.

## OPINION

ALLEN, Chancellor.

The claim asserted is for usurpation of a corporate opportunity. As described below, a curious circumstance renders the factual context of the claim unique. The opportunity allegedly usurped is a chance to acquire certain assets from Mackinac Cellular Corporation, most importantly a license granted by the Federal Communications Commission to build and operate a cellular telecommunications system on the eastern tip of Michigan's upper peninsula, an area designated Michigan 2 RSA. Plaintiff is Cellular Information Systems, Inc. ("CIS"), a Delaware corporation engaged presently and historically in the acquisition, building, operation and sale of cellular telecommunication licenses and businesses. Defendants are Richard Broz, who prior to November 23, 1994 was a member of the board of directors but not an officer or employee of CIS, and RFB Cellular, Inc., a Delaware corporation that is wholly owned by Mr. Broz. Through RFB Cellular, Mr. Broz, has since 1992 operated a cellular telecommunications business that owns the license to provide wireless cellular telecommunications service in the area designated Michigan 4 RSA, which lies directly east of Michigan 2 RSA, across the northernmost part of Lake Michigan.

On November 14, 1994 Mr. Broz caused RFB Cellular to enter into a contract with Mackinac Cellular to acquire its Michigan 2 RSA assets. This case arises out of that contract and the facts leading up to its execution.

In this action CIS seeks a declaration that Mr. Broz breached his fiduciary duty to CIS in negotiating and executing that contract without presenting the opportunity to buy the Michigan 2 RSA license to the CIS board. CIS seeks an order imposing a constructive trust on the contractual rights of Broz or RFB Cellular and damages. CIS asserts that in the circumstances disclosed by the evidence that failure resulted in the loss of that opportunity to CIS. That loss is actionable it says because, at the time the Mackinac contract was negotiated and executed CIS would have had an intense interest in this acquisition and it had the means available to pursue it.

This suit was filed on March 2, 1995 and, in light of the fact that the Broz–Mackinac contract was set to close on May 12, 1995, expedited treatment of the matter was ordered. Document and deposition discovery was rapidly agreed upon and completed. Mackinac intervened as a defendant. The case was tried on April 19 and 20. Following briefing and oral argument on May 5, 1995, the court committed to the litigants to decide the matter over the weekend so as to try to accommodate the commercial interests of the parties.

For the reasons set forth below I conclude that even though knowledge of the availabili-

ty of the Michigan 2 RSA license and its associated assets came to Mr. Broz wholly independently of his role on the CIS board, that opportunity was within the core business interests of CIS at the relevant times; that at such time CIS would have had access to the financing necessary to compete for the assets that were for sale; and that the CIS board of directors were not asked to and thus did not consider whether such action would have been in the best interests of the corporation. In these circumstances I conclude that Mr. Broz as a director of CIS violated his duty of loyalty to CIS by seizing this opportunity without formally informing the CIS board fully about the opportunity and facts surrounding it and by proceeding to acquire rights for his benefit without the consent of the corporation. *See Yiannatsis v. Stephanis,* Del.Supr., 653 A.2d 275 (1995). Before describing the reasoning that leads me to this conclusion, I turn to a brief recitation of the background facts as they appear from a preponderance of the credible evidence.

## I.

CIS was formed in 1988 to acquire, build-out, and operate licenses to provide "wire-based" or "wireless" cellular telecommunication services. Such licenses are granted originally and regulated by the Federal Communications Commission. The licenses are typically, if not uniformally, either for a Rural or a Metropolitan Service Area. Generally the United States is broken down into such areas by the FCC and for each such area one license to provide wireless cellular telephone services and one license to provide wire services to customers in that service area will be granted. CIS was successful in acquiring a number of such licenses for various regions in the country, but was not altogether successful in developing them and operating them at a profit. Like most such companies it was highly leveraged and by 1992 it was required to seek protection under the bankruptcy code. That proceeding was apparently a bitter one and while the company did emerge from bankruptcy under its former management in March 1994, it did not have good relations with its lenders. It did however own, when it emerged from bank-

ruptcy, thirteen FCC granted licenses to provide cellular telephone services and was operating businesses that did so.

Because of the possibility of various economies of scale (including some customer servicing advantages) it is advantageous to the supplier of cellular telecommunication services to operate contiguous service areas. The larger the "footprint" of the service area, in general, the better. Among the service licenses that CIS had when it emerged from bankruptcy were a group in the upper midwest: Duluth, Minn.; Eau Claire, Wis.; Great Falls, Minn.; Wausau, Wis.; Wis. RSA 1; Wis. RSA 6A–2 and Wis. RSA 3.

When it emerged from bankruptcy CIS was without sources of necessary financing, however. It embarked on a program of selling off its licenses. About this time, Mr. Richard Treibick, the CEO of CIS, learned of the availability of Michigan 2 RSA, but even though Michigan 2 RSA was in the region of the Wisconsin licenses, given the circumstances of the company, he expressed no interest. The evidence does not indicate that Treibick conferred with the board on this question, but it is not the sort of question that he would be expected to do so as a matter of duty and in all events the testimony indicates that the other CIS directors would have concurred in that judgment at that time.

Among the parties with whom Mr. Treibick negotiated concerning the CIS properties was Mr. Robert Price, of PriCellular Communications, Inc. ("Mr. Price" and "PriCellular" respectively). Initially, Mr. Price and Mr. Treibick negotiated with respect to certain specific license assets. They reached agreements in May 1994 for CIS to sell to PriCellular the Wisconsin 6A RSA, Wisconsin 3 RSA and CIS's option for 50.01% of the Wausau, Wisconsin MSA. By June, however, they were discussing the acquisition by PriCellular or an affiliate of PriCellular of all of the stock of CIS. It was PriCellular's business plan to try to put together a large service area in the upper midwest. This fact was known by Mr. Treibick in part at least as the basis for the negotiations. By late June the parties had reached agreement: PriCel-

lular would offer to buy all of the outstanding CIS stock at $2.00 a share cash (it had been trading in the pink sheets at $.25–$.50). All of the CIS directors except Broz and his lawyer Mr. Bloch signed contracts to sell their CIS stock to Price by the end of June. A condition of the closing of those contracts was PriCellular's closing on a tender offer for up to all of the public shares. The director contracts alone would convey more than 60% of the voting power of the company.

Also in June 1994 Mr. Broz, who through RFB Cellular independently owned and operated a cellular telecommunication company (Michigan RSA 4) approached Mr. Treibick and expressed his interests in acquiring Mackinac's Michigan 2 RSA license. The broker for the seller had independently approached Mr. Broz concerning any interest he might have in the Michigan 2 RSA property. Treibick expressed no interest in that property on behalf of CIS. In August Mr. Broz also mentioned his interest to directors Peter Schiff and Stanley Bloch, who later came to serve as Mr. Broz's lawyer in the Mackinac transaction.

Thus, two sets of negotiations over the period from June 1994 to November 1994 become relevant to understanding the setting of the present problem. The first set of negotiations are those between CIS and Pri-Cellular which lead to a series of stock sale contracts between the directors of CIS and PriCellular and to the extension of a August 2, 1994 cash tender offer for all shares at a price of $2.00 a share. The second set of negotiations are those between Mackinac and Broz, on the one hand and between Mackinac and PriCellular on the other with respect to the acquisition of Michigan 2 RSA, which

PriCellular sought as part of its upper midwest strategy.

With respect to the PriCellular/CIS negotiations, by June it was clear that both parties sought to achieve a transaction that would transfer control over CIS to PriCellular in exchange for cash. By June 28 at the latest it was clear that CIS and PriCellular had adopted a course designed to optimize the chance that CIS would become part of the PriCellular group of businesses. As noted above, all of the members of the board of CIS (except Mr. Broz and his lawyer Mr. Bloch) had each signed an individual stock sale contract. While those contracts had a number of conditions to closing, including FCC approval of the change in corporate control of the license holder and that Price close on an all cash all shares tender offer,[1] it is clear that the most significant indeed arguably the only significant piece of business for the then current members of the CIS board from early June to late November related to the closing of the PriCellular offer. In order to accommodate or facilitate that closing the board entered into a number of substantial transactions during this period.

Once the CIS board decided to sell control of CIS to PriCellular, it accommodated PriCellular's goal to accumulate a large "footprint" in the upper midwest. First, at PriCellular's request, CIS agreed to suspend its previously negotiated option to purchase a majority interest of the Wausau, Wisconsin MSA in order to allow PriCellular to acquire the majority interest. Second, CIS agreed to swap its Pine Bluff, Arkansas MSA and to pay approximately $10.55 million in cash and a note to be provided by PriCellular for the Minnesota 6 RSA.[2] Minnesota 6 RSA would,

---

1. The Purchase and Sale Agreement provides:
    (b) Conditions. The obligations of Seller and Purchaser hereunder are conditioned upon the satisfaction of the following conditions ...:
        (i) The Federal Communications Commission ("FCC") and ... all public service commissions ... exercising jurisdiction over CIS or any of its systems ... shall have consented to the change in control of CIS contemplated by this Agreement ...

. . . . .

        (x) In the case of Seller's obligations only, Purchaser shall have commenced and not withdrawn the [Tender] Offer. PX 1 p. 2–4.

2. One of PriCellular's major shareholders, McCaw, owned the other cellular system serving Pine Bluff. FCC rules prohibited ownership by an entity of more than one cellular system serving the same area. Thus, it was required that CIS transfer its ownership of Pine Bluff before PriCellular could acquire control of CIS. Tr. 62–63, 275–76.

in turn, contribute to the build-up of a cluster in the upper midwest for PriCellular.

During the period in which PriCellular was negotiating with CIS with respect to that company, it was also focusing attention upon acquiring Michigan 1 RSA and Michigan 2 RSA as part of its development of a large "footprint" in the upper midwest. Accordingly, on October 14, 1994, PriCellular, through a subsidiary, negotiated an option agreement with Mackinac to purchase Michigan 2 for $6.7 million. The option agreement provided, however, that Mackinac may sell to a third party for a price exceeding $7.2 million.[3]

As Michigan 2 is adjacent to RFB Cellular's Michigan 4, Mr. Broz was a logical candidate to acquire Michigan 2. Hence, David Rhodes, Mackinac's broker, sent an offer to purchase Michigan 2 to Mr. Broz. On June 28, 1994, the day the other directors signed stock sale agreement with PriCellular, Mr. Broz signed a confidentiality agreement to obtain information from Mackinac concerning the Michigan 2 RSA. Mr. Rhodes did not send an offer to CIS because he considered CIS financially unqualified.

By August 29 Mr. Broz had expressed interest to Mackinac in acquiring Michigan 2 RSA. By no later than the September 12, 1994 CIS board meeting, Mr. Broz learned of PriCellular's interest in putting together the upper midwest cluster including the Michigan 1 and Michigan 2 service areas. After learning of PriCellular's option agreement with Mackinac for the Michigan 2 RSA, Mr. Broz agreed to exceed the $7.2 million threshold to purchase it. On November 14, 1994, RFB Cellular and Mackinac signed a purchase contract at that price.

On November 16, 1994, Price learned for the first time that Broz was interested and indeed that Mackinac had entered into an agreement to sell Michigan 2 RSA for a consideration in excess of $7.2 million to Broz.

Mr. Broz never formally presented to the CIS board of his interest in acquiring the Michigan 2 RSA; he resigned from the CIS board upon the closing of the Price tender offer.

On November 23, 1994, PriCellular closed on its tender offer and on the directors' sales agreements, and thereby as a result of these transactions, PriCellular became the owner of 91% of voting power of CIS. On that same day, PriCellular exercised its option to acquire the CIS bank debt, and CIS closed on its acquisition of another upper midwest license, Minnesota 6 RSA.

## II.

■ The theory advanced to justify the relief sought is the usurpation of a corporate opportunity. It is basic that service as a director of a corporation entails the voluntary assumption of a duty of loyalty to the corporation, and in some instances to the stockholders directly. Broadly speaking this duty prevents or remedies conduct in which a corporate officer or director uses her power with respect to corporate processes, or property, or her access to confidential corporate information, to advantage herself in a transaction that is not entirely fair to the corporation. The so-called corporate opportunity doctrine, at least when one considers the core cases it covers, falls easily within this concept of loyalty. The classic corporate opportunity cases involve instances in which officers or directors use for personal advantage information that comes to them in their corporate capacity, by diverting a profitable transaction from the corporation. *Guth v. Loft*, Del. Supr., 5 A.2d 503 (1939); *Abbott Redmont Thinlite Corporation v. Remont*, 475 F.2d 85 (2d Cir.1973). Such cases are simply a form of misappropriation, not conceptually dissimilar from general torts of that description. *See* American Law Institute Restatement Second Torts §§ 222A, 223 (1965).

■ Since business men and women are not infrequently involved in a number of

---

**3.** Specifically, the option agreement in section 10(a) stated that:

at any time from the date hereof until November 15, 1994: (iii) MCC (Mackinac Cellular Corp.) may sell or enter into any agreement to sell the Assets or control thereof to any party other than PriCellular (i.e. PriCellular Wireless) for an aggregate consideration in excess of $7,200,000.00 without regard to the time or manner of payment of such consideration.

enterprises (this is especially true of corporate directors and principals in close corporations) the law of misappropriation of corporate opportunities has generated a number of tests to determine whether an opportunity that comes to the attention of such an individual was in equity one that should be regarded as "belonging to" a particular corporation. *See generally* Victor Brudney & Robert Charles Clark, *A New Look at Corporate Opportunities*, 94 Harv.L.Rev. 997 (1981). Traditionally one test was whether the corporation was engaged in the business that the opportunity presented and whether it was financially able to take advantage of the transaction. *Guth v. Loft*, Del.Supr., 5 A.2d 503 (1939); *David J. Greene & Co. v. Dunhill International, Inc.*, Del.Ch., 249 A.2d 427 (1968). One question that this case presents is whether the directors' obligation of loyalty under the corporate opportunity doctrine goes further than the tort of misappropriation would go to restrict business activity. That question is presented because it seems clear from the evidence that Mr. Broz did not misuse proprietary information that came to him in a corporate capacity nor did he otherwise use any power he might have over the governance of the corporation to advance his own interests. Thus if Mr. Broz is guilty of violating the duty of loyalty it must be by reason of a restriction assumed by a corporate director that is greater than the restriction that prevents persons generally from misusing the property or information of another. The corporate law teaches that there is such an obligation voluntarily assumed by every man and woman who agrees to serve as a corporate director. That duty for example prevents a director from personally engaging in material business competition with his corporation without the approval of the corporation. *Fender v. Prescott*, 101 A.D.2d 418, 476 N.Y.S.2d 128 (1984), *aff'd*, 64 N.Y.2d 1077, 489 N.Y.S.2d 880, 479 N.E.2d 225, (1985); *Morton v. Rank America, Inc.*, 812 F.Supp. 1062, 1070 (C.D.Cal. 1993) ("This [fiduciary] duty sharply limits a director or officer's business activities when those activities would compete with or otherwise injure the business of the corporation of which they are fiduciaries.") As stated below I conclude that Mr. Broz in competing in

October and November 1994 with respect to an opportunity that fell within CIS's natural scope of activities, under circumstances in which CIS's interests had come to substantially overlap with if not merge with PriCellular's interest, without the formal concurrence of the CIS board, Mr. Broz did take from CIS that with respect to which he had an obligation to defer to CIS.

### III.

Mr. Broz's principal point in this case is that CIS was not interested in pursuing a transaction such as the Mackinac acquisition at any time during 1994 while he was a director and thus he was permitted to do so. He was never required to refrain from active competition against PriCellular, he correctly observes. Indeed in our system we understand that we enjoy substantial benefits from energetic free competition in markets. Mr. Broz asserts that this case simply represents an attempt by a loser in such market competition, to whom he owed no fiduciary duty of loyalty, to deploy the corporate law to reverse the market result. The effort should be unavailing, according to Broz, because he never competed against CIS; he only competed against PriCellular. CIS was never interested in Michigan 2 RSA and was not legally or financially able to acquire it in any case, he says.

How then does market competition against PriCellular turn into a claim of usurpation of a CIS corporate opportunity? This is accounted for, of course, by the unusual fact that during the period in which Mr. Broz first learned of the sale of Michigan 2 RSA (June 1994); extended offers and revised offers to buy it (Aug.–Sept.); and signed a written contract (November 14), PriCellular—the entity against whom he was competing—was also independently (but to Mr. Broz's knowledge) negotiating with CIS to acquire control of the company to which Broz did owe loyalty. But things changed as these negotiations led to a PriCellular tender offer for all CIS shares in August and to CIS entering into various business transactions that were only consistent with the fact that the future for CIS was intended not to include further sell-off of assets and liqui-

dation, but the operation of the company as an operating company.

Thus according to plaintiff, CIS's cooperation with PriCellular to transfer control of the company to PriCellular radically changed the orientation of CIS from its position in the Spring of 1994, when selling off of licenses was the business plan. If it was reasonable to assume in early or mid 1994 that the company was winding down and would not be interested in the Michigan 2 transaction, it was not a reasonable assumption by the time Mr. Broz acquired rights in the Michigan 2 RSA license.

Plaintiff insists that Mr. Broz had an obligation to take this transaction to the CIS board before extending an offer whose acceptance would create rights and duties. That formality, it asserts, would have made an important difference in this case. While it disclaims the responsibility to prove that the failure to go to the board made a real difference, it asserts that it is realistically impossible to imagine it would not have made a vital difference. According to plaintiff the most significant concern to the CIS board from June through November was the negotiation and closing of the various stock purchase agreements and the public tender offer. The PriCellular offers were at a handsome premium. CIS stock had been trading in the range of $.25–$.50 a share, but Price was offering $2.00 per share. The CIS board had entered into significant corporate transactions to accommodate Price and so improve the possibility of closing the sale. It is incredible according to plaintiff that the board, had it been informed by Mr. Broz in September that he sought to acquire a cellular license which arguably fell within the business interests of CIS and which PriCellular was also interested in acquiring, would have consented or elected not to pursue the opportunity itself, after conferring with Mr. Price. If the corporation could legitimately impose on its outside director in favor of its negotiating partner, it is clear in which direction the economic interests of the corporation lie.

In assessing these arguments in light of the record evidence, I conclude (1) that the corporation could have legitimately required its director to abstain from the Mackinac transaction out of deference to its own interests in extending an offer, despite the fact that it came to such director in a wholly independent way, (that is the transaction is one that falls quite close to the core transactions that the corporation was formed to engage in); (2) that by no later than the time by which Price had extended the public tender offer, the circumstances of the company had changed so that it was quite plausibly in the corporation's interest and financially feasible for it to pursue the Mackinac transaction; (3) that in such circumstances as existed at the latest after October 14, 1994 (date of PriCellular's option contract on Michigan 2 RSA) it was the obligation of Mr. Broz as a director of CIS to take the transaction to the CIS board for its formal action; and (4) the after the fact testimony of directors to the effect that they would not have been interested in pursuing this transaction had it been brought to the board, is not helpful to defendant, in my opinion, because most of them did not know at that time of PriCellular's interest in the property and how it related to PriCellular's plan for CIS. Similarly this sort of after the fact testimony is a very thin substitute for an informed board decision made at a meeting in "real time" (i.e., while the opportunity to act with effect continues). (Both formality and the group dynamics of board action are important in corporate law. Formality in such circumstances is not "mere formality", it is treated by courts as important because it tends to focus attention on the need for deliberation and the existence of accountability structures. With respect to group dynamics, it is an old rule that boards may act with legal effect only at duly convened meetings at which a quorum is present. Again functional reasons underlie the law's insistence on correct form. *See* Robert C. Clark, *Corporate Law* 110–112 (1986)).

Thus I conclude that Mr. Broz did violate his obligation of loyalty to CIS by acquiring, without the prior consent of the CIS board, rights in a property that fell within CIS's core business, under circumstances which gave CIS a valid economic reason to make that acquisition itself and the means to do so. I recognize that this outcome advantages Pri-

Cellular in a competitive battle with Mr. Broz and that it is not the intended function of the corporate opportunity doctrine to do so. But that advantage is a coincidental consequence of application of the established doctrine in this case where the interests of the corporation evolved over the relevant period. For practical business reasons CIS's interests with respect to the Mackinac transaction came to merge with those of Price, even before the closing of its tender offer for CIS stock. This should have been apparent to CIS directors, including Mr. Broz. Even if the CIS directors were oriented simply to protect the interests of current CIS shareholders by optimizing the probability of the closing of the $2.00 per share tender offer, this merger of interests became apparent; by the time Mr. Broz executed the Mackinac contract it would have been clear that that act could have decreased to some extent the attraction to PriCellular of closing on the CIS tender offer and would in no event likely increase that probability. Thus those directors could surely have concluded that their duty (as well as their own financial interest as stockholders) required them to confer with PriCellular and to consider the possibility of cooperating with PriCellular if requested in an effort to win the Mackinac license for CIS, despite their own prior evaluation of the transaction as being of no interest to CIS in its post bankruptcy condition. Were the CIS directors oriented to a longer term perspective than the closing of the PriCellular tender offer, the merger of interests between CIS and PriCellular by the time of the Broz–Mackinac contract would appear even clearer. Such a director, if aware of PriCellular's interest in acquiring control of both CIS and the Michigan 2 RSA license might well have favored the acquisition of the Mackinac license by CIS or an affiliate, for reasons relating to the financial welfare of all constituencies involved in the enterprise. Thus that the result here may aid Price in its competition with Broz to acquire the Michigan 2 RSA license does not mean that that result is inappropriate under corporate law, since the interests of CIS were at the relevant time legitimately more closely aligned with those of PriCellular than those of Mr. Broz; the transaction was in all events one that was within CIS's core business; would feasibly be available to CIS; and the board was not afforded the opportunity to make a deliberate, informed board decision to forego such advantages as pursuit of the transaction might have afforded.

With respect to the feasibility of CIS taking advantage of the opportunity, Mr. Broz argues that CIS did not have available funds or credit to accomplish the transaction and that in fact the agreements that the company had entered with Price prevented the company from doing so, since they prevented any transaction outside of the regular course. A realistic assessment of this contention, however, shows it to be without substance. PriCellular, which had acquired an option to buy all of CIS outstanding bank debt, was in a position to waive any provision that might arguably have prevented CIS from buying the Michigan 2 RSA assets, had that been determined to be in the company's interests. Moreover, it is not disputed that PriCellular had available sources of financing to permit the funding of that purchase. Thus one cannot conclude factually that had CIS considered the matter at the appropriate time in November before Mr. Broz acted to create rights and duties in his wholly owned company, any decision the board may have made could not have been implemented because of a legal or financial impediment.

Mr. Broz places heavy reliance on the opinion in *Kaplan v. Fenton*, Del.Supr., 278 A.2d 834 (1971). He asserts that *Kaplan* is direct authority for the proposition that he had no obligation to go to CIS board before executing the Mackinac purchase contract. I do not read that case in that way. In *Kaplan* an opportunity to buy certain stock of a corporation in which Christiana Oil Company was interested was presented to the Christiana board in January 1963. After due consideration the board decided that the company would not pursue that opportunity, but would purchase shares of this company only for non-cash consideration and as part of an effort to acquire all stock of that class. Fenton, one of the directors, then undertook to negotiate an acquisition of certain of these shares. One month later he approached the CEO of the Christiana to explain the pro-

posed transaction that he had been presented with and to ask whether the matter should be taken back to the board. The CEO confirmed that Christiana had no interest in this block, which Fenton then bought. In October 1963 the Christiana board decided to extend an offer to all shares of this class of stock to exchange that stock for Christiana common stock. Shareholders of Christiana then instituted a derivative suit against Fenton claiming that he had usurped a corporate opportunity. The Supreme Court affirmed the trial court's dismissal of the complaint for failure to state a claim.

The vital difference between *Kaplan* and this case arises from the fact that in that case the matter was formally presented to the board and rejected by directors who had no financial interest in the decision and there had not been a material change of circumstances or of information between the time the board had previously considered the matter and the time the director had taken the business opportunity that came to him.

Here the board never formally considered the advisability of CIS attempting to acquire Michigan 2 RSA and, more importantly, there had been a very material change in the circumstances of CIS after any informal determination was made by the firm's CEO or other directors. By the time Mr. Broz entered into the Mackinac contract it should have been clear that he could no longer rely in good faith on the informal expressions of CIS's interest that may have occurred in the Spring or Summer of 1994. That cannot be said of Mr. Fenton in the *Kaplan* case.

### IV.

I turn then to the final aspect of this matter, the question of an appropriate remedy. CIS seeks the imposition of a constructive trust upon RFB Cellular's contract rights or an alternative remedy that will afford CIS the ability to purchase Michigan 2 RSA. It seeks as well some brief delay in the closing date of the Mackinac contract to allow it to assess the state of affairs before it needs to commit its cash at a closing. Finally it seeks a damage award against Mr. Broz for the difference between the Price option contract and the Broz–Mackinac sales con-

tract. The theory of this last element of remedy is that but for Broz's conduct CIS, as part of the PriCellular/CIS business group, would have enjoyed the benefits of the acquisition at the lower figure.

With respect to remedy, I note first that I accept Mackinac's position that the evidence does not show that it engaged in any wrongful conduct and that there is therefore no basis to impress an equitable remedy upon it. Rather its interests are deserving of respect. This fact does not preclude an equitable remedy between CIS and its former director, however. Mackinac's principal interest as a seller is in getting the price agreed upon on terms at least as good as those agreed upon.

■ Secondly, although I conclude that in these unusual circumstances at the critical times (at least in October) CIS had a legitimate interest in the Michigan 2 RSA acquisition, and that Broz failed to handle his interest in the acquisition correctly at that time, I also conclude that if an equitable remedy can be fashioned that affords to CIS an opportunity now to acquire this property at the price that Broz is willing to pay, then CIS will have suffered no cognizable damages. I recognize of course that PriCellular's interests will have in all likelihood then paid substantially more to acquire indirect control of Michigan 2 RSA than would have been paid had Mr. Broz never bestirred himself. But that is legally irrelevant. In the first instance, Broz had a privilege to compete against PriCellular and a higher price that PriCellular may be caused to pay by reason of such competition is not cognizable injury. CIS, the plaintiff, had no option right to buy Michigan 2 RSA. What CIS came, certainly by September and October 1994, to have was an interest in seeing PriCellular's tender offer close and an interest in seeing the post tender-offer company well situated. While under these circumstances, the board, if formally presented with all of the facts by Mr. Broz before he had RFB Cellular execute the Mackinac sales contract, might certainly have had CIS extend the offer instead, I do not believe CIS was in a position, even in these circumstances, to require its outside director simply to leave the field to Mr. Price. In these circumstances, CIS was entitled to def-

erence from its directors and, given the nature of the opportunity, was entitled to make the offer if it chose. But in no event was it entitled to assure that PriCellular paid Mackinac less than Broz was willing to pay. Taking this view, on the assumption that an equitable remedy can be implemented by which CIS is enabled to acquire the Michigan 2 RSA license at a price no greater than that set forth in the Broz–Mackinac contract, I cannot conclude that Mr. Broz can be required to pay as damages the higher price to which his interest in the property led.

Third, I come to the central remedy question, how to equitably adjust the interests here involved. I conclude that an order requiring Mr. Broz and RFB Cellular to proceed to close the Mackinac sales agreement (upon receipt of FCC approval, and advancement by CIS or any affiliate of the funds necessary to pay the price provided in the Broz–Mackinac contract at closing plus reasonable closing costs of buyer (excepting Broz's counsel fees)) is the appropriate form of order, unless Mackinac will consent to an assignment of all of the rights and duties of the buyer from RFB Cellular to CIS, in which event that assignment would constitute all of the relief that appears equitable in the circumstances. Beyond that I note that I expect that all parties to this litigation will proceed in a good faith manner to effectuate the resolution here reached, unless a stay is granted.

The parties shall confer very promptly to attempt to implement this resolution in a timely fashion.