**Robert F. BROZ and RFB Cellular, Inc.,**
**Defendants Below, Appellants,**

v.

**CELLULAR INFORMATION SYSTEMS,**
**INC., a Delaware Corporation,**
**Plaintiff Below, Appellee.**

**No. 208, 1995.**

Supreme Court of Delaware.

Submitted: December 19, 1995.
Decided: March 22, 1996.
Rehearing Denied: April 11, 1996.

Stephen C. Norman and Michael A. Pittenger of Potter, Anderson & Corroon, Wilmington; Michael J. Silverberg (argued), and Theodore C. Max of Phillips, Nizer, Benjamin, Krim & Ballon LLP, New York City, for Appellants Robert F. Broz and RFB Cellular, Inc.

Kenneth J. Nachbar and Karen L. Pascale of Morris, Nichols, Arsht & Tunnell, Wilmington; Paul Vizcarrondo, Jr. (argued), Meir Feder and Marc Ashley of Wachtell, Lipton, Rosen & Katz, New York City, for Plaintiff Below, Appellee, Cellular Information Systems, Inc.

Before VEASEY, C.J., WALSH and HOLLAND, JJ.

VEASEY, Chief Justice:

In this appeal, we consider the application of the doctrine of corporate opportunity. The Court of Chancery decided that the defendant, a corporate director, breached his fiduciary duty by not formally presenting to the corporation an opportunity which had come to the director individually and independent of the director's relationship with the corporation. Here the opportunity was not one in which the corporation in its current mode had an interest or which it had the financial ability to acquire, but, under the unique circumstances here, that mode was subject to change by virtue of the impending acquisition of the corporation by another entity.

We conclude that, although a corporate director may be shielded from liability by offering to the corporation an opportunity which has come to the director independently and individually, the failure of the director to present the opportunity does not necessarily result in the improper usurpation of a corporate opportunity. We further conclude that, if the corporation is a target or potential target of an acquisition by another company which has an interest and ability to entertain the opportunity, the director of the target company does not have a fiduciary duty to present the opportunity to the target company. Accordingly, the judgment of the Court of Chancery is **REVERSED**.

## I. THE CONTENTIONS OF THE PARTIES AND THE DECISION BELOW

Robert F. Broz ("Broz") is the President and sole stockholder of RFB Cellular, Inc. ("RFBC"), a Delaware corporation engaged in the business of providing cellular telephone service in the Midwestern United States. At the time of the conduct at issue in this appeal, Broz was also a member of the board of directors of plaintiff below-appellee, Cellular Information Systems, Inc. ("CIS"). CIS is a publicly held Delaware corporation and a competitor of RFBC.

The conduct before the Court involves the purchase by Broz of a cellular telephone service license for the benefit of RFBC.[1] The license in question, known as the Michigan-2 Rural Service Area Cellular License ("Michigan-2"), is issued by the Federal Communications Commission ("FCC") and entitles its holder to provide cellular telephone service to a portion of northern Michigan. CIS brought an action against Broz and RFBC for equitable relief, contending that the purchase of this license by Broz constituted a usurpation of a corporate opportunity properly belonging to CIS, irrespective of whether or not CIS was interested in the Michigan-2 opportunity at the time it was offered to Broz.

---

1. The Court recognizes that the actual purchase of the Michigan-2 license was consummated by RFBC as a corporate entity, rather than by Broz acting as an individual for his own benefit. Broz is, however, the sole party in interest in RFBC and all actions taken by RFBC, including the acquisition of Michigan-2, are accomplished at the behest of Broz. Therefore, insofar as the purchase of Michigan-2 is concerned, the Court will not distinguish between the actions of Broz and those of RFBC in analyzing Broz' alleged breach of fiduciary duty.

The principal basis for the contention of CIS is that PriCellular, Inc. ("PriCellular"), another cellular communications company which was contemporaneously engaged in an acquisition of CIS, was interested in the Michigan–2 opportunity. CIS contends that, in determining whether the Michigan–2 opportunity rightfully belonged to CIS, Broz was required to consider the interests of PriCellular insofar as those interests would come into alignment with those of CIS as a result of PriCellular's acquisition plans.

After trial, the Court of Chancery agreed with the contentions of CIS and entered judgment against Broz and RFBC. *See Cellular Information Systems, Inc. v. Broz*, Del. Ch., 663 A.2d 1180 (1995). The court held that: (1) irrespective of the fact that the Michigan–2 opportunity came to Broz in a manner wholly independent of his status as a director of CIS, the Michigan–2 license was an opportunity that properly belonged to CIS; (2) due to an alignment of the interests of CIS and PriCellular arising out of PriCellular's efforts to acquire CIS, Broz breached his fiduciary duty by failing to consider whether the opportunity was one in which PriCellular would be interested; (3) despite the fact that CIS was aware of the opportunity and expressed no interest in pursuing it, Broz was required formally to present the transaction to the CIS board prior to seizing the opportunity for his own; and (4) absent formal presentation to the board, Broz' acquisition of Michigan–2 constituted an impermissible usurpation of a corporate opportunity. The trial court imposed a constructive trust on the agreement to purchase Michigan–2 and directed that the right to purchase the license be transferred to CIS. From this judgment, Broz and RFBC appeal.

Broz contends that the Court of Chancery erred in holding that he breached his fiduciary duties to CIS and its stockholders. Specifically, Broz asserts that he was under no obligation formally to present the corporate opportunity to the CIS Board of Directors. Broz further contends that PriCellular had not consummated its acquisition of CIS at the time of his decision to purchase Michigan–2, and that, accordingly, he was not obligated to consider the interests of PriCellular.

We agree with Broz and hold that: (1) the determination of whether a corporate fiduciary has usurped a corporate opportunity is fact-intensive and turns on, *inter alia,* the ability of the corporation to make use of the opportunity and the company's intent to do so; (2) while presentation of a purported corporate opportunity to the board of directors and the board's refusal thereof may serve as a shield to liability, there is no *per se* rule requiring presentation to the board prior to acceptance of the opportunity; and (3) on these facts, Broz was not required to consider the interests of PriCellular in reaching his determination whether or not to purchase Michigan–2.

## II. FACTS

Broz has been the President and sole stockholder of RFBC since 1992. RFBC owns and operates an FCC license area, known as the Michigan–4 Rural Service Area Cellular License ("Michigan–4"). The license entitles RFBC to provide cellular telephone service to a portion of rural Michigan. Although Broz' efforts have been devoted primarily to the business operations of RFBC, he also served as an outside director of CIS at the time of the events at issue in this case. CIS was at all times fully aware of Broz' relationship with RFBC and the obligations incumbent upon him by virtue of that relationship.

In April of 1994, Mackinac Cellular Corp. ("Mackinac") sought to divest itself of Michigan–2, the license area immediately adjacent to Michigan–4. To this end, Mackinac contacted Daniels & Associates ("Daniels") and arranged for the brokerage firm to seek potential purchasers for Michigan–2. In compiling a list of prospects, Daniels included RFBC as a likely candidate. In May of 1994, David Rhodes, a representative of Daniels, contacted Broz and broached the subject of RFBC's possible acquisition of Michigan–2. Broz later signed a confidentiality agreement at the request of Mackinac, and received the offering materials pertaining to Michigan–2.

Michigan–2 was not, however, offered to CIS. Apparently, Daniels did not consider CIS to be a viable purchaser for Michigan–2 in light of CIS' recent financial difficulties.

The record shows that, at the time Michigan–2 was offered to Broz, CIS had recently emerged from lengthy and contentious Chapter 11 proceedings. Pursuant to the Chapter 11 Plan of Reorganization, CIS entered into a loan agreement that substantially impaired the company's ability to undertake new acquisitions or to incur new debt. In fact, CIS would have been unable to purchase Michigan–2 without the approval of its creditors.

The CIS reorganization resulted from the failure of CIS' rather ambitious plans for expansion. From 1989 onward, CIS had embarked on a series of cellular license acquisitions. In 1992, however, CIS' financing failed, necessitating the liquidation of the company's holdings and reduction of the company's total indebtedness. During the period from early 1992 until the time of CIS' emergence from bankruptcy in 1994, CIS divested itself of some fifteen separate cellular license systems.[2] CIS contracted to sell four additional license areas on May 27, 1994,[3] leaving CIS with only five remaining license areas, all of which were outside of the Midwest.

On June 13, 1994, following a meeting of the CIS board, Broz spoke with CIS' Chief Executive Officer, Richard Treibick ("Treibick"), concerning his interest in acquiring Michigan–2. Treibick communicated to Broz that CIS was not interested in Michigan–2.[4] Treibick further stated that he had been made aware of the Michigan–2 opportunity prior to the conversation with Broz, and that any offer to acquire Michigan–2 was rejected. After the commencement of the PriCellular tender offer, in August of 1994, Broz contacted another CIS director, Peter Schiff ("Schiff"), to discuss the possible acquisition of Michigan–2 by RFBC. Schiff, like Treibick, indicated that CIS had neither the wherewithal nor the inclination to purchase Michigan–2. In late September of 1994, Broz also contacted Stanley Bloch ("Bloch"), a director and counsel for CIS, to request that Bloch represent RFBC in its dealings with Mackinac. Bloch agreed to represent RFBC, and, like Schiff and Treibick, expressed his belief that CIS was not at all interested in the transaction. Ultimately, all the CIS directors testified at trial that, had Broz inquired at that time, they each would have expressed the opinion that CIS was not interested in Michigan–2.[5]

On June 28, 1994, following various overtures from PriCellular concerning an acquisition of CIS, six CIS directors[6] entered into agreements with PriCellular to sell their shares in CIS at a price of $2.00 per share. These agreements were contingent upon, *inter alia*, the consummation of a PriCellular tender offer for all CIS shares at the same price. Pursuant to their agreements with PriCellular, the CIS directors also entered into a "standstill" agreement which prevented the directors from engaging in any transaction outside the regular course of CIS' business or incurring any new liabilities until the close of the PriCellular tender offer. On August 2, 1994, PriCellular commenced a tender offer for all outstanding shares of CIS at $2.00 per share. The PriCellular tender offer mirrored the standstill agreements entered into by the CIS directors.

PriCellular's tender offer was originally scheduled to close on September 16, 1994.

2. Of these fifteen licenses, three were sold to subsidiaries of PriCellular. Specifically, the licenses held by CIS for areas in Wisconsin and Minnesota were acquired by the PriCellular subsidiaries. These transactions closed immediately upon CIS' emergence from bankruptcy.

3. These license areas, all located in Wisconsin, were to be sold to PriCellular. After completing its acquisition of CIS, however, PriCellular determined that ownership of the licenses should remain with CIS.

4. In fact, during a deposition given in March of 1995, Treibick testified that he didn't "know who frankly was hawking [the Michigan–2 license] ... at the time ... [W]e said forget it. It was not something we would have bought if they offered it to us for nothing."

5. We assume *arguendo* that informal contacts and individual opinions of board members are not a substitute for a formal process of presenting an opportunity to a board of directors. Nevertheless, in our view such a formal process was not necessary under the circumstances of this case in order for Broz to avoid liability. These contacts with individual board members do, however, tend to show that Broz was not acting surreptitiously or in bad faith.

6. All the members of the CIS board of directors except Broz and Bloch agreed to tender their shares to PriCellular.

At the time the tender offer was launched, however, the source of the $106,000,000 in financing required to consummate the transaction was still in doubt. PriCellular originally planned to structure the transaction around bank loans. When this financing fell through, PriCellular resorted to a junk bond offering. PriCellular's financing difficulties generated a great deal of concern among the CIS insiders whether the tender offer was, in fact, viable. Financing difficulties ultimately caused PriCellular to delay the closing date of the tender offer from September 16, 1994 until October 14, 1994 and then again until November 9, 1994.

On August 6, September 6 and September 21, 1994, Broz submitted written offers to Mackinac for the purchase of Michigan–2. During this time period, PriCellular also began negotiations with Mackinac to arrange an option for the purchase of Michigan–2. PriCellular's interest in Michigan–2 was fully disclosed to CIS' chief executive, Treibick, who did not express any interest in Michigan–2, and was actually incredulous that PriCellular would want to acquire the license. Nevertheless, CIS was fully aware that PriCellular and Broz were bidding for Michigan–2 and did not interpose CIS in this bidding war.

In late September of 1994, PriCellular reached agreement with Mackinac on an option to purchase Michigan–2. The exercise price of the option agreement was set at $6.7 million, with the option remaining in force until December 15, 1994. Pursuant to the agreement, the right to exercise the option was not transferrable to any party other than a subsidiary of PriCellular. Therefore, it could not have been transferred to CIS. The agreement further provided that Mackinac was free to sell Michigan–2 to any party who was willing to exceed the exercise price of the Mackinac–PriCellular option contract by at least $500,000. On November 14, 1994, Broz agreed to pay Mackinac $7.2 million for the Michigan–2 license, thereby meeting the terms of the option agreement. An asset purchase agreement was thereafter executed by Mackinac and RFBC.

Nine days later, on November 23, 1994, PriCellular completed its financing and closed its tender offer for CIS. Prior to that point, PriCellular owned no equity interest in CIS. Subsequent to the consummation of the PriCellular tender offer for CIS, members of the CIS board of directors, including Broz, were discharged and replaced with a slate of PriCellular nominees. On March 2, 1995, this action was commenced by CIS in the Court of Chancery.

At trial in the Court of Chancery, CIS contended that the purchase of Michigan–2 by Broz constituted the impermissible usurpation of a corporate opportunity properly belonging to CIS. Thus, CIS asserted that Broz breached his fiduciary duty to CIS and its stockholders. CIS admits that, at the time the opportunity was offered to Broz, the board of CIS would not have been interested in Michigan–2, but CIS asserts that Broz usurped the opportunity nevertheless. CIS claims that Broz was required to look not just to CIS, but to the articulated business plans of PriCellular, to determine whether PriCellular would be interested in acquiring Michigan–2. Since Broz failed to do this and acquired Michigan–2 without first considering the interests of PriCellular in its capacity as a potential acquiror of CIS, CIS contends that Broz must be held to account for breach of fiduciary duty.

In assessing the contentions of the parties in light of the facts of record, the Court of Chancery concluded:

(1) that [CIS] ... could have legitimately required its director [Broz] to abstain from the Mackinac transaction out of deference to its own interests in extending an offer, despite the fact that it came to such director in a wholly independent way, (that is the transaction is one that falls quite close to the core transactions that the corporation was formed to engage in); (2) that by no later than the time by which Price had extended the public tender offer, the circumstances of the company had changed so that it was quite plausibly in the corporation's interest and financially feasible for it to pursue the Mackinac transaction; (3) that in such circumstances as existed at the latest after October 14, 1994 (date of PriCellular's option contract on Michigan 2 RSA) it was the obligation

of Mr. Broz as a director of CIS to take the transaction to the CIS board for its formal action; and (4) the after the fact testimony of directors to the effect that they would not have been interested in pursuing this transaction had it been brought to the board, is not helpful to defendant, in my opinion, because most of them did not know at that time of PriCellular's interest in the property and how it related to PriCellular's plan for CIS.

663 A.2d at 1186. Based on these conclusions, the court held that:

> even though knowledge of the availability of the Michigan 2 RSA license and its associated assets came to Mr. Broz wholly independently of his role on the CIS board, that opportunity was within the core business interests of CIS at the relevant times; that at such time CIS would have had access to the financing necessary to compete for the assets that were for sale; and that the CIS board of directors were not asked to and thus did not consider whether such action would have been in the best interests of the corporation. In these circumstances I conclude that Mr. Broz as a director of CIS violated his duty of loyalty to CIS by seizing this opportunity without formally informing the CIS board fully about the opportunity and facts surrounding it and by proceeding to acquire rights for his benefit without the consent of the corporation. *See Yiannatsis v. Stephanis,* Del.Supr., 653 A.2d 275 (1995).

663 A.2d at 1181–82.

### III. STANDARD AND SCOPE OF APPELLATE REVIEW

■ The determination after trial of the Court of Chancery that Broz breached his fiduciary duty of loyalty involves both a question of law and a question of fact. *Science Accessories Corp. v. Summagraphics Corp.,* Del.Supr., 425 A.2d 957, 963 (1980) (whether corporate opportunity has been usurped "depends ... on the facts and the reasonable inferences to be drawn therefrom"); *Johnston v. Greene,* Del.Supr., 121 A.2d 919, 923 (1956); *Guth v. Loft, Inc.,* Del.Supr., 5 A.2d 503, 513 (1939) (whether a corporate opportunity has been usurped is "a factual question to be decided by reasonable inferences from

objective facts"). As we have stated previously, a trial court's finding pertaining to a purported breach of the duty of loyalty, "being fact dominated," is, "on appeal, entitled to substantial deference unless clearly erroneous or not the product of a logical and deductive process." *Cede & Co. v. Technicolor, Inc.,* Del.Supr., 634 A.2d 345, 360 (1993) (quoting *Citron v. Fairchild Camera & Instrument Corp.,* Del.Supr., 569 A.2d 53, 64 (1989)); *see also Levitt v. Bouvier,* Del.Supr., 287 A.2d 671, 673 (1972).

In all events, if it can be shown that the court erred in formulating or applying legal precepts, this Court's review is plenary. *Delaware Alcoholic Beverage Wholesalers, Inc. v. Ayers,* Del.Supr., 504 A.2d 1077, 1081 (1986); *see also Rohner v. Niemann,* Del. Supr., 380 A.2d 549, 552 (1977).

### IV. APPLICATION OF THE CORPORATE OPPORTUNITY DOCTRINE

The doctrine of corporate opportunity represents but one species of the broad fiduciary duties assumed by a corporate director or officer. A corporate fiduciary agrees to place the interests of the corporation before his or her own in appropriate circumstances. In light of the diverse and often competing obligations faced by directors and officers, however, the corporate opportunity doctrine arose as a means of defining the parameters of fiduciary duty in instances of potential conflict. The classic statement of the doctrine is derived from the venerable case of *Guth v. Loft, Inc.* In *Guth,* this Court held that:

> if there is presented to a corporate officer or director a business opportunity which the corporation is financially able to undertake, is, from its nature, in the line of the corporation's business and is of practical advantage to it, is one in which the corporation has an interest or a reasonable expectancy, and, by embracing the opportunity, the self-interest of the officer or director will be brought into conflict with that of the corporation, the law will not permit him to seize the opportunity for himself.

*Guth,* 5 A.2d at 510–11.

■ The corporate opportunity doctrine, as delineated by *Guth* and its progeny, holds

that a corporate officer or director may not take a business opportunity for his own if: (1) the corporation is financially able to exploit the opportunity; (2) the opportunity is within the corporation's line of business; (3) the corporation has an interest or expectancy in the opportunity; and (4) by taking the opportunity for his own, the corporate fiduciary will thereby be placed in a position inimicable to his duties to the corporation. The Court in *Guth* also derived a corollary which states that a director or officer *may* take a corporate opportunity if: (1) the opportunity is presented to the director or officer in his individual and not his corporate capacity; (2) the opportunity is not essential to the corporation; (3) the corporation holds no interest or expectancy in the opportunity; and (4) the director or officer has not wrongfully employed the resources of the corporation in pursuing or exploiting the opportunity. *Guth,* 5 A.2d at 509.

■ Thus, the contours of this doctrine are well established. It is important to note, however, that the tests enunciated in *Guth* and subsequent cases provide guidelines to be considered by a reviewing court in balancing the equities of an individual case. No one factor is dispositive and all factors must be taken into account insofar as they are applicable. Cases involving a claim of usurpation of a corporate opportunity range over a multitude of factual settings. Hard and fast rules are not easily crafted to deal with such an array of complex situations. As this Court noted in *Johnston v. Greene,* Del. Supr., 121 A.2d 919 (1956), the determination of "[w]hether or not a director has appropriated for himself something that in fairness should belong to the corporation is 'a factual question to be decided by reasonable inference from objective facts.'" *Id.* at 923 (quoting *Guth,* 5 A.2d at 513). In the instant case, we find that the facts do not support the conclusion that Broz misappropriated a corporate opportunity.

We note at the outset that Broz became aware of the Michigan–2 opportunity in his individual and not his corporate capacity. As the Court of Chancery found, "Broz did not misuse proprietary information that came to him in a corporate capacity nor did he otherwise use any power he might have over the governance of the corporation to advance his own interests." 663 A.2d at 1185. This fact is not the subject of serious dispute. In fact, it is clear from the record that Mackinac did not consider CIS a viable candidate for the acquisition of Michigan–2. Accordingly, Mackinac did not offer the property to CIS. In this factual posture, many of the fundamental concerns undergirding the law of corporate opportunity are not present (*e.g.,* misappropriation of the corporation's proprietary information). The burden imposed upon Broz to show adherence to his fiduciary duties to CIS is thus lessened to some extent. *See Science Accessories Corp.,* 425 A.2d at 964 (holding that because opportunity to purchase new technology was "an 'outside' opportunity not available to SAC, defendants' failure to disclose the concept to SAC and their taking it for themselves for purposes of competing with SAC cannot be found to be in breach of any agency fiduciary duty"). Nevertheless, this fact is not dispositive. The determination of whether a particular fiduciary has usurped a corporate opportunity necessitates a careful examination of the circumstances, giving due credence to the factors enunciated in *Guth* and subsequent cases.

■ We turn now to an analysis of the factors relied on by the trial court. First, we find that CIS was not financially capable of exploiting the Michigan–2 opportunity. Although the Court of Chancery concluded otherwise, we hold that this finding was not supported by the evidence. *Levitt,* 287 A.2d at 673. The record shows that CIS was in a precarious financial position at the time Mackinac presented the Michigan–2 opportunity to Broz. Having recently emerged from lengthy and contentious bankruptcy proceedings, CIS was not in a position to commit capital to the acquisition of new assets. Further, the loan agreement entered into by CIS and its creditors severely limited the discretion of CIS as to the acquisition of new assets and substantially restricted the ability of CIS to incur new debt.

The Court of Chancery based its contrary finding on the fact that PriCellular had purchased an option to acquire CIS' bank debt.

Thus, the court reasoned, PriCellular was in a position to exercise that option and then waive any unfavorable restrictions that would stand in the way of a CIS acquisition of Michigan–2. The trial court, however, disregarded the fact that PriCellular's own financial situation was not particularly stable. PriCellular was unable to finance the acquisition of CIS through conventional bank loans and was forced to use the more risky mechanism of a junk bond offering to raise the required capital. Thus, the court's statement that "PriCellular had other sources of financing to permit the funding of that purchase" is clearly not free from dispute. Moreover, as discussed *infra*, the fact that PriCellular had available sources of financing is immaterial to the analysis. At the time that Broz was required to decide whether to accept the Michigan–2 opportunity, PriCellular had not yet acquired CIS, and any plans to do so were wholly speculative. Thus, contrary to the Court of Chancery's finding, Broz was not obligated to consider the contingency of a PriCellular acquisition of CIS and the related contingency of PriCellular thereafter waiving restrictions on the CIS bank debt. Broz was required to consider the facts only as they existed at the time he determined to accept the Mackinac offer and embark on his efforts to bring the transaction to fruition. *Guth*, 5 A.2d at 513.

Second, while it may be said with some certainty that the Michigan–2 opportunity was within CIS' line of business, it is not equally clear that CIS had a cognizable interest or expectancy in the license.[7] Under the third factor laid down by this Court in *Guth*, for an opportunity to be deemed to belong to the fiduciary's corporation, the corporation must have an interest or expectancy in that opportunity. As this Court stated in *Johnston*, 121 A.2d at 924, "[f]or the corporation to have an actual or expectant interest in any specific property, there must be some tie between that property and the nature of the corporate business." Despite the fact that the nature of the Michigan–2 opportunity was historically close to the core operations of CIS, changes were in process. At the time the opportunity was presented, CIS was actively engaged in the process of divesting its cellular license holdings. CIS' articulated business plan did not involve any new acquisitions. Further, as indicated by the testimony of the entire CIS board, the Michigan–2 license would not have been of interest to CIS even absent CIS' financial difficulties and CIS' then current desire to liquidate its cellular license holdings.[8] Thus, CIS had no

7. The language in the *Guth* opinion relating to "line of business" is less than clear:

> Where a corporation is engaged in a certain business, and an opportunity is presented to it embracing an activity as to which it has fundamental knowledge, practical experience and *ability to pursue*, which, logically and naturally, is adaptable to its business *having regard for its financial position*, and is *consonant with its reasonable needs and aspirations for expansion*, it may properly be said that the opportunity is within the corporation's line of business.

*Guth*, 5 A.2d at 514 (emphasis supplied). This formulation of the definition of the term "line of business" suggests that the business strategy and financial well-being of the corporation are also relevant to a determination of whether the opportunity is within the corporation's line of business. Since we find that these considerations are decisive under the other factors enunciated by the Court in *Guth*, we do not reach the question of whether they are here relevant to a determination of the corporation's line of business.

8. At trial, each of the members of the CIS board testified to his belief that CIS would not have been interested in the Michigan–2 opportunity at the time it was presented to Broz. The Court of Chancery chose to disregard this testimony, holding that "the after the fact testimony of directors to the effect that they would not have been interested in pursuing this transaction had it been brought to the board, is not helpful to defendant, in my opinion, because most of them did not know at that time of PriCellular's interest in the property and how it related to PriCellular's plan for CIS." 663 A.2d at 1186. We disagree with the court's assessment. First, as discussed, *infra*, Broz was required to consider the situation only as it existed when the opportunity was presented. Thus, the fact the CIS directors were unaware of the future plans of PriCellular does not impact adversely on the weight to be ascribed to this particular evidence. Second, testimony of the CIS board is extremely helpful to establish the propriety of Broz' actions. As discussed, *infra*, Broz was not required to present this opportunity to the board. He was free to evaluate the situation and determine whether the opportunity was one properly belonging to CIS. Absent such formal presentation, however, this Court must make an after-the-fact assessment of an essentially stale factual scenario. In such a setting, the testimony of the directors who controlled the business and affairs of the corporation at the time the opportunity was allegedly usurped is

interest or expectancy in the Michigan–2 opportunity. *Cf. Guth*, 5 A.2d at 514 (holding that Loft had an interest or expectancy in the Pepsi opportunity by virtue of its need for cola syrup for use in its retail stores).

Finally, the corporate opportunity doctrine is implicated only in cases where the fiduciary's seizure of an opportunity results in a conflict between the fiduciary's duties to the corporation and the self-interest of the director as actualized by the exploitation of the opportunity. In the instant case, Broz' interest in acquiring and profiting from Michigan–2 created no duties that were inimicable to his obligations to CIS. Broz, at all times relevant to the instant appeal, was the sole party in interest in RFBC, a competitor of CIS. CIS was fully aware of Broz' potentially conflicting duties. Broz, however, comported himself in a manner that was wholly in accord with his obligations to CIS. Broz took care not to usurp any opportunity which CIS was willing and able to pursue. Broz sought only to compete with an outside entity, PriCellular, for acquisition of an opportunity which both sought to possess. Broz was not obligated to refrain from competition with PriCellular. Therefore, the totality of the circumstances indicates that Broz did not usurp an opportunity that properly belonged to CIS.

**A. Presentation to the Board:**

█ In concluding that Broz had usurped a corporate opportunity, the Court of Chancery placed great emphasis on the fact that Broz had not formally presented the matter to the CIS board. The court held that "in such circumstances as existed at the latest after October 14, 1994 (date of PriCellular's option contract on Michigan 2 RSA) it was the obligation of Mr. Broz as a director of CIS to take the transaction to the CIS board for its formal action...." 663 A.2d at 1185. In so holding, the trial court erroneously grafted a new requirement onto the law of

corporate opportunity, *viz.*, the requirement of formal presentation under circumstances where the corporation does not have an interest, expectancy or financial ability.

The teaching of *Guth* and its progeny is that the director or officer must analyze the situation *ex ante* to determine whether the opportunity is one rightfully belonging to the corporation. If the director or officer believes, based on one of the factors articulated above, that the corporation is not entitled to the opportunity, then he may take it for himself. Of course, presenting the opportunity to the board creates a kind of "safe harbor" for the director, which removes the specter of a *post hoc* judicial determination that the director or officer has improperly usurped a corporate opportunity. Thus, presentation avoids the possibility that an error in the fiduciary's assessment of the situation will create future liability for breach of fiduciary duty. It is not the law of Delaware that presentation to the board is a necessary prerequisite to a finding that a corporate opportunity has not been usurped.

The numerous cases decided since *Guth* are in full accord with this view of the doctrine. For instance, in *Field v. Allyn*, Del. Ch., 457 A.2d 1089 (1983), the Court of Chancery held that a director or officer is free to take a business opportunity for himself once the corporation has rejected it *or* if it can be shown that the corporation is not in a position to take the opportunity. The *Field* court held this to be true even if the fiduciary became aware of the opportunity by virtue of the fiduciary's position in the corporation. *Id.* at 1099. Notably, this Court affirmed the *Field* holding on the basis of the well reasoned opinion of the court below. *Field v. Allyn*, Del.Supr., 467 A.2d 1274 (1983). *Field* is not unique, however. The view that presentation to the board is not required where the opportunity is one that the corporation is incapable of exercising is also expressed in other cases. *See, e.g., Wolfensohn*

---

relevant. Such testimony gives a direct indication of the business posture and expectations of the corporation during the relevant period of time. The Court of Chancery also held that "this sort of after the fact testimony is a very thin substitute for an informed board decision made at a meeting in 'real time' (*i.e.*, while the oppor-

tunity to act with effect continues)." *Id.* While it is true that contemporaneous decisionmaking or unanimous written consent is required for board action (8 *Del.C.* § 141(f)), in our view, this testimony of the CIS board was probative and should not have been wholly discounted. *See* n. 5, *supra*.

*v. Madison Fund, Inc.*, Del.Supr., 253 A.2d 72, 76 (1969).

Other cases, such as *Kaplan v. Fenton*, Del.Supr., 278 A.2d 834 (1971), have found no violation of the corporate opportunity doctrine where the director determined that the corporation was not interested in the opportunity, but never made formal presentation to the board. The director in *Kaplan* asked the CEO and another board member if the corporation would be interested in the opportunity and whether he should present the opportunity to the board. These questions were answered in the negative and the director then acquired the opportunity for himself. The *Kaplan* Court found no breach of the doctrine, despite the absence of formal presentation.[9]

The Court of Chancery cited *Yiannatsis v. Stephanis*, Del.Supr., 653 A.2d 275 (1995), in support of the proposition that formal presentation to the board of directors is a necessary prerequisite to a corporate fiduciary taking an opportunity for his own. *See* 663 A.2d at 1182. In *Yiannatsis*, the opportunity in question was a block of stock in a closely held corporation, the holder of which was subject to a right of first refusal held by the corporation. Two of the three directors of the corporation caused the company to refuse the opportunity and, as a result, the corporation never invoked its right of first refusal. This Court held that the corporate fiduciaries had acted surreptitiously to keep the opportunity from being exercised by the corporation, when they had no reasonable ground to believe that the corporation would not be interested therein. This background of bad faith is not present in the case at bar. Here, Broz had substantial reason to believe that CIS was not interested in or able to take advantage of the Michigan-2 opportunity. Accordingly, *Yiannatsis* is not relevant to the analysis here.

Thus, we hold that Broz was not required to make formal presentation of the Michigan-2 opportunity to the CIS board prior to taking the opportunity for his own. In so holding, we necessarily conclude that the Court of Chancery erred in grafting the additional requirement of formal presentation onto Delaware's corporate opportunity jurisprudence.[10]

**B. Alignment of Interests Between CIS and PriCellular:**

■ In concluding that Broz usurped an opportunity properly belonging to CIS, the Court of Chancery held that "[f]or practical business reasons CIS' interests with respect to the Mackinac transaction came to merge with those of PriCellular, even before the closing of its tender offer for CIS stock." Based on this fact, the trial court concluded that Broz was required to consider PriCellular's prospective, post-acquisition plans for CIS in determining whether to forego the opportunity or seize it for himself. Had Broz done this, the Court of Chancery determined that he would have concluded that CIS was entitled to the opportunity by virtue of the alignment of its interests with those of PriCellular.

We disagree. Broz was under no duty to consider the interests of PriCellular when he chose to purchase Michigan-2. As stated in *Guth*, a director's right to "appropriate [an] ... opportunity depends on the circumstances existing at the time it presented itself to him without regard to subsequent events." *Guth*, 5 A.2d at 513. At the time Broz purchased Michigan-2, PriCellular had not yet acquired CIS. Any plans to do so would still have been wholly speculative. Accordingly, Broz was not required to consider the contingent and uncertain plans of PriCellular in reaching his determination of how to proceed.

9. As the parties note, *Kaplan* is distinguishable in that the *Kaplan* board previously rejected a similar offer to the one exploited by the defendant director. The board of CIS, however, had demonstrated a comparable lack of interest by divesting itself of holdings similar to the license at issue.

10. Recognizing the interests the Court of Chancery sought to promote, however, we note that formal presentation to the board is often the preferred—or "safe"—approach, and we note that this litigation might have been unnecessary had this precaution been observed.

Whether or not the CIS board would, at some time, have chosen to acquire Michigan–2 in order to make CIS a more attractive acquisition target for PriCellular or to enhance the synergy of any combined enterprise, is speculative. The trial court found this to be a plausible scenario and therefore found that, pursuant to the factors laid down in *Guth*, CIS had a valid interest or expectancy in the license. This speculative finding cuts against the statements made by CIS' Chief Executive and the entire CIS board of directors and ignores the fact that CIS still lacked the wherewithal to acquire Michigan–2, even if one takes into account the possible availability of PriCellular's financing. Thus, the fact of PriCellular's plans to acquire CIS is immaterial and does not change the analysis.

In reaching our conclusion on this point, we note that certainty and predictability are values to be promoted in our corporation law. *See Williams v. Geier,* Del.Supr., 671 A.2d 1368, 1385 n. 36 (1996). Broz, as an active participant in the cellular telephone industry, was entitled to proceed in his own economic interest in the absence of any countervailing duty. The right of a director or officer to engage in business affairs outside of his or her fiduciary capacity would be illusory if these individuals were required to consider every potential, future occurrence in determining whether a particular business strategy would implicate fiduciary duty concerns. In order for a director to engage meaningfully in business unrelated to his or her corporate role, the director must be allowed to make decisions based on the situation as it exists at the time a given opportunity is presented. Absent such a rule, the corporate fiduciary would be constrained to refrain from exploiting any opportunity for fear of liability based on the occurrence of subsequent events. This state of affairs would unduly restrict officers and directors and would be antithetical to certainty in corporation law.

## V. CONCLUSION

The corporate opportunity doctrine represents a judicially crafted effort to harmonize the competing demands placed on corporate fiduciaries in a modern business environment. The doctrine seeks to reduce the possibility of conflict between a director's duties to the corporation and interests unrelated to that role. In the instant case, Broz adhered to his obligations to CIS. We hold that the Court of Chancery erred as a matter of law in concluding that Broz had a duty formally to present the Michigan–2 opportunity to the CIS board. We also hold that the trial court erred in its application of the corporate opportunity doctrine under the unusual facts of this case, where CIS had no interest or financial ability to acquire the opportunity, but the impending acquisition of CIS by PriCellular would or could have caused a change in those circumstances.

Therefore, we hold that Broz did not breach his fiduciary duties to CIS. Accordingly, we **REVERSE** the judgment of the Court of Chancery holding that Broz diverted a corporate opportunity properly belonging to CIS and imposing a constructive trust.