# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

MARIC HEALTHCARE, LLC; NEW )
MEXICO TREATMENT SERVICES, )
LLC; and COLORADO TREATMENT )
SERVICES, LLC )
                                    )
           Plaintiffs, )
                                    )
             v. )       C.A. No. 2023-0878-NAC
                                    )
PERLA RAMIREZ-GROOTHUIS )
                                    )
           Defendant. )

## POST-TRIAL MEMORANDUM OPINION

Date Submitted: October 13, 2025
Date Decided: April 16, 2026

John M. Seaman, Michael T. Manuel, Clara E. Hubbard, ABRAMS & BAYLISS LLP, Wilmington, Delaware; *Counsel for Plaintiffs Maric Healthcare, LLC, New Mexico Treatment Services, LLC, and Colorado Treatment Services, LLC.*

Glenn A. Brown, REAL WORLD LAW, P.C., Wilmington, Delaware; Thomas P. Howard, Kammie Cuneo, THOMAS P. HOWARD, LLC, Louisville, Colorado; *Counsel for Defendant Perla Ramirez-Groothuis.*

**COOK, V.C.**

The plaintiffs seek more than $4 million in damages from the defendant, who set up an opioid treatment facility two miles from the plaintiffs' clinic. The plaintiffs proved liability and damages resulting from the defendant's solicitation of a single key employee. They are entitled to travels costs for the replacement hire.

## I. FACTUAL BACKGROUND

The facts are drawn from a relatively slim post-trial record, which includes 21 stipulations of fact, approximately 200 exhibits, deposition testimony of eight witnesses, and trial testimony from four.[1] Having evaluated the credibility of the witnesses and weighed the evidence, the Court makes the following findings by a preponderance of the evidence.

### A. Maric

With the opioid addiction crisis raging, Maric Healthcare LLC ("Maric") grew to include twenty-nine opioid addiction treatment centers across seven states in the United States.[2] Maric is a Delaware limited liability company based in Tulsa, Oklahoma[3] and owned by Michael Margolis.[4] Alan Jamieson served as its Chief

---

[1] Citations to Pre-Trial Stip. refer to the Joint Pre-Trial Stipulation and Order. Dkt. 118. Joint trial exhibits are cited as "JX ___," trial testimony is cited as "TT___([Name])," and depositions are cited as "([Name]) Dep. ____." Per the Joint Pre-Trial Stipulation and Order, any objections to deposition testimony and trial exhibits would be addressed in post-trial briefing unless resolved at or before trial. Pre-Trial Stip. VIII.A & C.

[2] TT 5:19–20 (Ann Jamieson).

[3] Pre-Trial Stip. ¶¶ 1, 2.

[4] TT 7:13–14 (Ann Jamieson).

Executive Officer since its formation in the early 2010s.[5] He resigned towards the end of 2023 due, in part, to a difference in vision with Margolis.[6] His wife, Ann Jamieson, assumed the role of chief operating officer in 2018, and in 2024 changed roles to become chief clinical officer.[7] Starting out as a counselor, she has worked with Margolis in the opioid addiction treatment industry since 2004.[8]

Ann Jamieson described Maric's "vision statement" to be "increasing access" to "everybody who needs treatment for opioid abuse disorder."[9] Its clinics provide medication-assisted treatment plans using methadone and suboxone, as well as counseling services to patients struggling with substance use disorder.[10] Much of its patient population is insured by Medicaid.[11] Maric operates its clinics through Delaware limited liability companies.[12] The Maric entity for Colorado was Colorado Treatment Services, LLC ("CTS").

---

[5] TT 9:4–7 (Ann Jamieson).

[6] TT 9:17–23 (Ann Jamieson). He also resigned due to illness. TT 9:13–14 (Ann Jamieson).

[7] TT 8:5–9:1 (Ann Jamieson).

[8] TT 7:13–24 (Ann Jamieson).

[9] TT 48:9–12 (Ann Jamieson).

[10] Pre-Trial Stip. ¶ 1–3.

[11] TT 93:1–4 (Ann Jamieson).

[12] Pre-Trial Stip. ¶ 1.

**B.     Ramirez' Success at CTS**

Defendant Perla Ramirez-Groothuis began her employment at CTS in Colorado Springs as a counselor for substance abuse patients in 2016.[13]  Before that, she spent several years with the Idaho Department of Corrections working as a substance abuse counselor for inmates and parolees.[14]

As a counselor at CTS, Ramirez conducted individual counseling sessions, case management, and care coordination for individuals with opioid addiction receiving methadone treatment.[15]  Less than a year into the job, Maric promoted Ramirez to serve as the program director at CTS' new Outpatient Treatment Program ("OTP") located in Pueblo, Colorado ("CTS Pueblo").[16]

Pueblo is one of the many urban centers grappling with the opioid addiction crisis in this country.  The statistics are grim.  Ramirez described Pueblo as having one of the highest rates of opioid-related deaths in the country.[17]  Because of its intergenerational use, Ramirez would see grandparents, aunts, uncles, and children coming in as patients.[18]  In an application for grant funding, CTS recorded Pueblo as having the highest average number of heroin related deaths per year in southern

---

[13] *Id.* ¶ 14.

[14] TT 392:1–8, 395:20 (Ramirez).

[15] TT 392:23–393:4 (Ramirez).

[16] *Id.*

[17] TT 441:2–6 (Ramirez).

[18] *Id.*

Colorado, at 9.6 per 100,000 residents, between 2013 to 2017.[19] In the period of 2014 to 2016, Pueblo's death rate was even higher, at 15 per 100,000 residents, compared to 8.8 for the state as a whole.[20] Even with the high need, there was only one other OTP operating in Pueblo.[21]

About a year and a half after CTS Pueblo's opening, Alan Jamieson promoted Ramirez to executive director of CTS.[22] As executive director, Ramirez reported directly to Alan Jamieson, the chairman of the board of directors of Maric at the time.[23] Alan Jamieson and Ramirez were "very close," and "friends."[24]

Ramirez' new responsibilities covered CTS' three OTPs, all in Colorado, and included regulatory compliance, billing, and management.[25] Ramirez also became Manager and President of CTS and signed CTS' Limited Liability Company Agreement ("CTS Agreement") in that capacity.[26] The CTS Agreement provided that

---

[19] JX 506 at 50.

[20] *Id.*

[21] TT 180:15–18 (Ann Jamieson).

[22] Pre-Trial Stip. ¶ 15; TT 17:11–12, 18:8–10 (Ann Jamieson).

[23] TT 17:16–22 (Ann Jamieson).

[24] *Id.*

[25] TT 398:23–399:5 (Ramirez).

[26] JX 2, 3. Ramirez mistakenly signed on Maric's signature line. JX 3. In a subsequent version, Maric's CEO Alan Jamieson signed on behalf of Maric. JX 41.

Ramirez, as Manager of the entity, "shall be subject to the fiduciary duties that would be due by an officer or a director of a Delaware corporation to such corporation."[27]

Ramirez' upward trajectory continued. In late 2021, after serving as executive director of CTS for about three years, Ramirez was promoted to regional executive director, in which role she oversaw Maric's OTPs in New Mexico and Colorado.[28] Ramirez executed, as Manager and President, a limited liability company agreement with New Mexico Treatment Services ("NMTS"), a Delaware limited liability company.[29] She agreed to be subject to the same fiduciary duties as in the CTS Agreement.[30] NMTS operated four OTPs in New Mexico.[31]

## C. Ramirez Forms Elevate to Provide Consulting Services

As Ramirez' responsibilities grew, she began receiving requests from Colorado's State Opioid Treatment Authority ("SOTA") to assist providers in

---

[27] JX 41 § 14. My impression from trial is that, in signing the CTS Agreement, Ramirez likely did not fully understand the import of the fiduciary responsibilities to which she was agreeing. Instead, I suspect she continued to view herself simply as an employee and manager (in the colloquial sense) of Maric. TT 491:2–12 (Ramirez). This in no way lessened the fiduciary duties that Ramirez owed in signing on as a Manager of CTS. But, having sat through trial, I believe it does provide helpful context in understanding some of the decisions Ramirez would later make.

[28] TT 398:6–13 (Ramirez).

[29] JX 11.

[30] *Id.* § 14. Ramirez executed an amended and restated CTS and NMTS Agreement with substantially the same provisions on July 3, 2023. JX 40, 41.

[31] Pre-Trial Stip. ¶ 3; JX 11.

5

establishing methadone treatment clinics throughout the state.[32]  For example, one request from SOTA was to assist a provider in setting up a methadone treatment clinic in Aurora, Colorado—a request for which Alan Jamieson was supportive.[33]  To facilitate the consulting services she provided, Ramirez created two Colorado-based entities.  She filed articles of organization in Colorado forming RMZ Holdings LLC ("RMZ") on May 28, 2021.[34]  About a month later, Ramirez, through RMZ, formed Elevate Healthcare, LLC ("Elevate") for her consulting work.[35]  Steven Young, M.D., the medical director at CTS Pueblo, also assisted in providing consulting services with Ramirez and signed, and became a member under, the Limited Liability Company Agreement of Elevate Healthcare, LLC.[36]

Ramirez provided consulting advice related to licenses, facility compliance, administrative compliance, clinical compliance, medical compliance, and systems and supplier contracts.[37]  Ramirez provided the entities for which she consulted sample

---

[32] TT 410:10–24 (Ramirez).  Several consulting referrals came from SOTA.  TT 399:15–21, 425:22–426:3 (Ramirez).  One of the referrals came from a friend of Dr. Young.  TT 430:13–18 (Ramirez).

[33] TT 410:10–411:5, 412:7–10 (Ramirez).

[34] JX 601.

[35] JX 503; TT 415:4–8 (Ramirez).

[36] JX 9; TT 430:19–431:10 (Ramirez).

[37] *See, e.g.*, JX 602.

policies, procedures and forms that Maric used.[38]   These forms were available in the clinic's hallway where all staff could access them.[39]   All staff had copies of them on their desk, and were available to patients upon request.[40]   Although Alan Jamieson was supportive of assisting SOTA and other clinics,[41] and generally aware of Ramirez' consulting activities,[42] Ramirez did not expressly seek CTS' or NMTS' permission to engage in these services or disclose that she was compensated for them.[43]   But no entity for which she consulted set up a clinic near a Maric OTP.[44]   And, indeed, the consulting work resulted in patient referrals for Maric if the patients lived near Pueblo.[45]

## D.      Ramirez Opens a New Clinic in Pueblo

While Ramirez was overseeing several clinics across two states, CTS Pueblo was "bu[r]sting at the seams" due to overgrowth.[46]   The clinic's average monthly

---

[38] TT 562:11–16 (Ramirez).  For other entities, Ramirez drafted the policies and procedures forms from scratch.  Ramirez Dep. 56:19–20, 61:1–4, 14–15.

[39] TT 419:9–16 (Ramirez).

[40] *Id.*

[41] Alan Dep. 43:17–44:10; TT 411–412, 645 (Ramirez); JX 18, 43.

[42] TT 572:6–13 (Ramirez).

[43] TT 572–578 (Ramirez).

[44] TT 566:3–5 (Ramirez) ("The clinics that I helped open were all over 100 miles, at least."); TT 425:22–426:23, 640:12–19, 641:4–12 (Ramirez).

[45] TT 417:1–6 (Ramirez).

[46] TT 437:2–5 (Ramirez).

7

patient census increased from 507 in 2021 to 680 in 2022.[47] Staff members were "overburdened" and searched for employment elsewhere.[48] The counselor caseload was unsustainable [49] and became a "vicious spiral" precipitating more staff turnover,[50] and adversely impacting patient care.[51] CTS aimed to assign 55 to 60 patients per counselor,[52] but the caseload had grown to around 80 patients per counselor. [53] Lines wrapped around the facility. [54] The lobby was frequently congested.[55] Approximately 500 patients was considered sustainable.[56] But by the end of 2022, CTS Pueblo was serving approximately 700 patients, outnumbering CTS'

---

[47] JX 72 at 4 (citing CTS_00006491, 96), JX 83. Plaintiffs noted on the JX list an objection to JX 83 on the basis of completeness, but Plaintiffs did not pursue the objection in post-trial briefing or post-trial argument. Per the Joint Pre-Trial Stipulation and Order, any objections to deposition testimony and trial exhibits would be addressed in post-trial briefing unless resolved at or before trial. Pre-Trial Stip. VIII. C.; *see also* TT 24–25. Plaintiffs did not raise this objection in post-trial briefing; the objection is waived.

[48] TT 437:8–14 (Ramirez)

[49] TT 453:9–12 (Ramirez).

[50] TT 437:11–14 (Ramirez).

[51] TT 453:23–454:5 (Ramirez).

[52] TT 66:16–21, 189:5–7 (Ann Jamieson); TT 453:4–8 (Ramirez).

[53] *See* TT 189:18–190:4 (Ann Jamieson).

[54] TT 437:8–18 (Ramirez).

[55] TT 437:9 (Ramirez).

[56] TT 456:1–15 (Ramirez).

OTPs in Greeley and Colorado Springs each.[57]  Eventually, CTS Pueblo's staff at the front desk turned patients away as intakes reached a maximum level.[58]

Due to CTS Pueblo's capacity limits and Pueblo's high need, Ramirez inquired with Maric whether it would open another clinic. But Alan Jamieson informed her that it would not.[59]  This was apparently because "opening new facilities [was] financed out of cash flow" from existing clinics.[60]  But after 2021, cash flow constraints limited expansion and caused Maric to shut down three clinics that were in the process of being opened.[61]  Thus, the last clinic Maric opened was in Florida in 2019.[62]  It did not intend to open any other clinics.[63]  Maric also would not open a

---

[57] JX 83; TT 441:7–9 (Ramirez).

[58] TT 455:12–19 (Ramirez).

[59] TT 436:11–19 (Ramirez); Alan Dep. 23:10–21 ("Okay. Given the sizes of those cities, do you think it was likely that Maric would've ever put a second location in any of them? . . . THE WITNESS: No. Q.  And given the fact that Maric hadn't . . . built another location since 2019, anywhere except in Florida, do you think it was likely that Maric was putting another location in any of those smaller Colorado cities?   A.  No."); *see also id.* 29:4–8 ("Would you agree that during the time you worked there through the end of 2023, Maric chose not to take advantage of any further business opportunities that may have been available in Pueblo, Colorado. A. Yes.").

[60] Alan Dep. 15:10–20.

[61] *Id.*

[62] TT 103:6–14 (Ann Jamieson).

[63] Alan Dep. 16:13–16.

second treatment center in a location in which there was already an existing Maric clinic.[64]

With Maric unable and unwilling to open another clinic in Pueblo, Ramirez worked with Dr. Young to open one. Beginning in October 2022, Ramirez searched for a potential location for Elevate to open an OTP.[65] Later that winter, Elevate entered into a lease at a location about two miles from CTS Pueblo.[66] Ramirez submitted regulatory applications and other paperwork, including policies, procedures, and consent forms for licensure and certification to the State of Colorado.[67] Shortly thereafter, the Colorado Behavioral Health Administration approved a license for Elevate to deliver Substance Use Disorder Treatment Services.[68] By February 2023, Elevate was a certified healthcare provider.[69]

Elevate next hired staff to run the clinic. Although Ramirez was still serving as Manager of CTS and regional executive director of Maric, she hired Ursula Hollins,

---

[64] *Id*. 24–25. Alan Jamieson explained that there were two cities with two Maric clinics, but those were not opened by Maric and were instead acquired in a separate transaction. Those clinics also operated in large population centers, namely Fort Worth, Texas and Oklahoma City, Oklahoma. *Id*.

[65] JX 63 at 14.

[66] JX 20.

[67] JX 17, 63 at 21.

[68] JX 519.

[69] *See* National Provider Identifier at Elevate Healthcare LLC, https://npir.org/providers/ahc/261qm2800x/tsmfqy (last visited June 4, 2025).

the program director at CTS Pueblo, as executive director at Elevate.[70]  Through advertisements on Indeed,[71]  Hollins hired in turn additional staff, several of whom quit CTS.[72]  On March 20, 2023, Elevate officially opened.[73]

Upon Elevate's opening, however, Ramirez did not resign from CTS, despite the conflicts that could arise from her dual roles at CTS and Elevate.  Instead, Ramirez sought to stabilize CTS Pueblo.  To replace Hollins, Ramirez reassigned the then-program director of CTS Colorado Springs, Kristi Brewster, to serve as interim director at CTS Pueblo.[74]  But Brewster did not fit into the role well.  Several counselors quit, citing Brewster as the reason.[75]

Issues also arose regarding patient intakes at CTS Pueblo during Brewster's tenure there.  Due to high counselor caseloads, a CTS employee responsible for caseload and quality assurance, Johnny Vialpando, placed a temporary moratorium on taking new patients.[76]  In addition, at least 21 patients from CTS Pueblo went to

---

[70] TT 587–88 (Ramirez).

[71] TT 459:22–460:3 (Ramirez).

[72] TT 445:10–15, 446:5–8 (Ramirez).

[73] On the same day, Dr. Young also became the medical director at Elevate and entered into an independent contractor agreement.  JX 24.

[74] TT 597–98 (Ramirez).

[75] TT 192:16–18 (Ann Jamieson).

[76] TT 192:15–24 (Ann Jamieson); JX 72 at 3.

Elevate to receive a guest-dose treatment on May 30.[77] The record remains unclear as to why the patients received a guest dosing at Elevate, but it seems likely that it was due to a power system failure at CTS Pueblo.[78] In any event, there is no evidence that Elevate retained any of these patients afterwards.[79] The record also does not reflect that any potential new CTS patients went to Elevate during the patient intake hold.

After a few months of serving in the role, Brewster was terminated as program director of CTS Pueblo because she was "causing a lot of stress . . . and disruption."[80] Ramirez then reassigned Isabella Del Castillo from Maric's Albuquerque Treatment Services to replace Brewster as the new program director in June 2023.[81]

Towards the end of the summer, Alan Jamieson discovered that Ramirez formed Elevate through a search of Elevate and RMZ's publicly available articles of organization.[82] He was "heartbroken."[83] Ann Jamieson flew to Colorado to confront Ramirez.[84] Ramirez resigned on August 2, 2023, while Ann Jamieson was still in the

---

[77] JX 524.

[78] TT 463:13–464:10 (Ramirez).

[79] Alan Dep. 63:10–17.

[80] TT 194:13–195:5 (Ann Jamieson).

[81] Del Castillo Dep. 8:7–14.

[82] TT 26:17–22 (Ann Jamieson).

[83] TT 26:24 (Ann Jamieson).

[84] TT 31:23–32:3 (Ann Jamieson).

air.[85]  Towards the end of 2023, Alan Jamieson also resigned from Maric due in part to health and "a difference in vision for what he wanted Maric [ ] to be" from Maric's owner's vision, Margolis.[86]

CTS Pueblo's average monthly patient census decreased from 680 in 2022 to 628 in 2023.[87]  It fell further to 563 in 2024.[88]  Despite the decrease in average patient census, Maric has not identified a single patient that left CTS for Elevate.  At least through the time discovery closed in this action, Elevate has not turned a profit.[89]

## E.    This Action

On August 25, 2023, Plaintiffs Maric, NMTS, and CTS initiated this action by filing a complaint against Defendant Ramirez.  Plaintiffs allege that Ramirez breached her duty of loyalty by usurping a business opportunity and engaging in competitive behavior during her tenure at CTS and NMTS (Count I).  They further allege that the wrongful diversion of patients to Elevate constituted intentional interference with existing contractual relationships and prospective business advantage (Count III).  Finally, Plaintiffs raise claims for conversion and misappropriation of trade secrets concerning the use of Plaintiffs' policies, procedures and forms (Counts II and IV).

---

[85] JX 46, 63 at 21; TT 31:21–23:3 (Ann Jamieson).

[86] TT 9:8–23 (Ann Jamieson).

[87] JX 72 at 4.

[88] *Id.*

[89] JX 80 at 20 (Rubin Report) (citing to Elevate_000413, Def_000613).

13

In litigating this action, Plaintiffs failed to engage with important aspects of discovery until after key deadlines passed. A few examples follow. In answering Defendant's standard, early interrogatories concerning damages, Plaintiffs responded that the discovery was premature as their damages calculations would be the subject of expert discovery. But, when the time came to disclose experts, Plaintiffs failed to identify anyone. Later—just three months before trial—Plaintiffs popped up with a supplemental interrogatory response outlining a damages calculation prepared by Maric's Chief Financial Officer, Mary Clark.[90] Plaintiffs also served discovery subpoenas on numerous third parties months after the close of fact discovery. Similarly, months after the close of discovery—and just two weeks before trial—Plaintiffs suddenly produced hundreds of documents that they asserted they would rely on at trial. Defendant filed a motion in limine to exclude the untimely produced documents, which the Court granted. A three-day trial took place from April 23–25, 2025. The Court heard post-trial argument on October 13, 2025.

## II. ANALYSIS

Plaintiffs brought little to prove their claims. With a bare bones written record and a factually unsupported and assumption-riddled damages analysis, Plaintiffs basically ask the Court to fill in the blanks. But this is not a circumstance in which equity will reach out and do Plaintiffs' work for them. Ramirez credibly testified that she opened Elevate to meet a severe need in the Pueblo community, and although she

---

[90] *See* JX 72.

14

did so while working for Maric, she was considered an excellent manager and employee who helped steady the ship. To be sure, Ramirez owed fiduciary duties. But, as will be discussed in detail below, nearly all of Plaintiffs' claims fail due to large and surprising evidentiary gaps on liability and damages.

I address Plaintiffs' claim in turn below, beginning with Plaintiffs' various fiduciary duty claims. I then conclude by addressing Plaintiffs' potpourri of ancillary claims and their request for fee shifting.

## A. Breach of Fiduciary Duty

"A claim for breach of fiduciary duty requires proof of two elements: (1) that a fiduciary duty existed and (2) that the defendant breached that duty."[91] "Although a claim for breach of fiduciary duty has only two formal elements, a beneficiary cannot obtain a meaningful remedy without additional showings that parallel the other elements of a traditional common-law tort."[92] "One is harm to the beneficiary or a benefit wrongly received by the fiduciary."[93] "Another is a sufficiently convincing

---

[91] *McKenna v. Singer*, 2017 WL 3500241, at *15 (Del. Ch. July 31, 2017) (quotation omitted).

[92] *Arxada Holdings NA Inc. v. Harvey*, 351 A.3d 519, 570 (Del. Ch. 2026).

[93] *Id.*

15

causal linkage between the breach and the remedy sought."[94]  "A court may award nominal damages when a breach does not warrant a meaningful remedy."[95]

Ramirez owed fiduciary duties to Plaintiffs.  The operating agreements of CTS and NMTS did not modify or eliminate the default fiduciary duties owed by managers of the entities.[96]  Instead, in executing CTS' and NMTS' operating agreements, Ramirez expressly agreed to be subject to the traditional fiduciary duties owed by an officer or director of a Delaware corporation.[97]  Until her resignation, she therefore owed fiduciary duties to CTS, NMTS and their sole member, Maric.

### 1.  Usurpation of a Business Opportunity

Plaintiffs' marquee claim is for usurpation of business opportunity.  Based on the evidence presented at trial, the need for opioid addiction treatment in Pueblo was overwhelming.  For this reason, Plaintiffs' usurpation claim had the feel of someone holding an overflowing bucket in a rainstorm and complaining that someone twenty feet away is also holding a bucket and competing for their rain.  In any event, for the reasons I explain below, I conclude Plaintiffs are not entitled to judgment in their favor on their usurpation claim.

---

[94] *Id.*

[95] *Id.*

[96] 6 *Del. C.* § 18-1101(c).

[97] *See, e.g.*, JX 41 § 14.

16

### a. Plaintiffs Have Not Proven Liability

"The corporate opportunity doctrine is a species of a corporate officer's broad fiduciary duties."[98] In *Broz v. Cellular Information Systems, Inc.*, the Delaware Supreme Court held that a "corporate officer or director" usurps a business opportunity if:

> (1) the corporation is financially able to exploit the opportunity; (2) the opportunity is within the corporation's line of business; (3) the corporation has an interest or expectancy in the opportunity; and (4) by taking the opportunity for his own, the corporate fiduciary will thereby be placed in a position inimicable to his duties to the corporation.[99]

*Broz* provides "guidelines to be considered by a reviewing court in balancing the equities of an individual case."[100] "No one factor is dispositive and all factors must be taken into account insofar as they are applicable."[101] "Hard and fast rules are not easily crafted" here.[102]

---

[98] *Sorrento Therapeutics, Inc. v. Mack*, 2023 WL 5670689, at *24 (Del. Ch. Sept. 1, 2023) (citing *Broz v. Cellular Info. Sys., Inc.*, 673 A.2d 148, 154–55 (Del. 1996)).

[99] 673 A.2d 148, 155 (Del. 1996)). Conversely, "a corporate officer may take a corporate opportunity if: (1) it is presented to him in his individual capacity; (2) the opportunity is not essential to the corporation; (3) the corporation has no interest or expectancy in the opportunity; and (4) the officer does not wrongfully employ the resources of the corporation in pursuing the opportunity." *Sorrento Therapeutics, Inc.*, 2023 WL 5670689, at *25 (citation omitted).

[100] *Sorrento Therapeutics, Inc.*, 2023 WL 5670689, at *25 (citation omitted).

[101] *Id.* (citation omitted).

[102] *Broz*, 673 A.2d at 154–55.

As for the first *Broz* factor, whether the company had the financial ability to take on the opportunity, the court has "flexibility" in determining this factor.[103] "There is no bright-line standard."[104] The court may consider "whether the corporation is in a position to commit capital, notwithstanding the fact that the corporation is actually solvent."[105]

Maric was not in the financial position to open another clinic in Pueblo. Maric had not opened a new clinic since 2019 and never opened a clinic in a city where there already was a Maric treatment center.[106] Alan Jamieson, Maric's CEO, also stated that it was not Maric's goal to open any new clinics.[107] "[O]pening new facilities [was] financed out of cash flow" from existing clinics,[108] but that was not an option for Maric after 2021.[109] Indeed, Maric closed several clinics in Florida.[110]

The evidence at trial suggested that Maric needed, if anything, to scale back significantly in Pueblo, not expand. CTS Pueblo was substantially understaffed and unable to serve the existing number of patients, compelling a pause on new patient

---

[103] *In re Riverstone Nat'l, Inc. S'holder Litig.*, 2016 WL 4045411, at *9 (Del. Ch. July 28, 2016).

[104] *Sorrento Therapeutics, Inc.*, 2023 WL 5670689, at *25 (citation omitted).

[105] *In re Riverstone Nat'l, Inc. S'holder Litig.*, 2016 WL 4045411, at *9.

[106] Alan Dep. 24–25.

[107] *Id.* 16:13–16.

[108] *Id.* 15:10–20.

[109] *Id.*

[110] *Id.*

intakes and necessitating a decrease in patient counts. Ramirez decided to open Elevate only after she determined that Maric did not intend to open another clinic in Pueblo. Ramirez credibly testified that she inquired with Alan Jamieson, the CEO at the time, about opening another location in Pueblo.[111] As mentioned, Alan Jamieson said it was unlikely that Maric would ever open a second clinic in Pueblo.[112] Given the record before me, I conclude Maric was not in a financial position to open another clinic in Pueblo.

The second *Broz* factor asks whether the opportunity was within the company's line of business. "[A] company's line of business includes all activities where the company has 'fundamental knowledge, practical experience and ability to pursue' provided that the activity is 'consonant with its reasonable needs and aspirations for expansion.'"[113] This factor "should be given flexibility when the case requires."[114] Maric clinics provide methadone and suboxone treatments, as well as counseling services to patients struggling with substance use disorder. There is no dispute that Elevate provides the same services. This factor points in Plaintiffs' favor.

---

[111] TT 436:11–19 (Ramirez).

[112] Alan Dep. 23:10–21; *see also id.* 29:4–8.

[113] *SDF Funding LLC v. Fry*, 2022 WL 1511594, at *16 (Del. Ch. May 13, 2022) *(*quoting *Guth v. Loft, Inc.*, 5 A.2d 503, 514 (1939)). The Delaware Supreme Court in *Broz* found this language in *Guth* to be "less than clear," because it blended other elements of the test. *Broz*, 673 A.2d at 156, n.7.

[114] *Sorrento Therapeutics, Inc.*, 2023 WL 5670689, at *26 (quoting *Guth*, 5 A.2d at 514).

19

As to the third *Broz* factor, Maric had an interest or expectancy in Elevate. "The interest or expectancy factor . . . largely concerns whether there is a tie between the opportunity and the nature of the corporation's business."[115] "The answer typically turn[s] on whether the individual who identified the opportunity did so in an official capacity."[116] "When a company rejects an opportunity, it no longer has an interest or expectancy in that opportunity."[117] But "it is not the law of Delaware that presentation to the board is a necessary prerequisite to a finding that a corporate opportunity has not been usurped."[118]

Maric, at least for the purposes of this third factor, had an interest or expectancy in the opportunity to open another clinic given the indisputable tie that the opportunity had to Maric's business.[119] Although not necessarily required to, had Ramirez formally presented the opportunity, Maric certainly may have rejected it thus freeing Ramirez to pursue the opportunity of her own. But she did not. Nor has Ramirez shown that she learned of or became involved in the opportunity in her individual capacity. As executive director, Ramirez was responsible for supervising

---

[115] *Id.* (citation omitted).

[116] *Metro Storage Int'l LLC v. Harron*, 275 A.3d 810, 853 (Del. Ch.), *judgment entered sub nom. In re Metro Storage Int'l LLC v. Harron* (Del. Ch. 2022).

[117] *Sorrento Therapeutics, Inc.*, 2023 WL 5670689, at *26.

[118] *Broz*, 673 A.2d at 157.

[119] *See Sorrento Therapeutics, Inc.*, 2023 WL 5670689, at *26 ("The interest or expectancy factor implicates many of the same considerations as the former factor and largely concerns whether there is a tie between the opportunity and the nature of the corporation's business.").

Maric's Colorado clinics, which inferably would, for example, include some role in being aware of and identifying the need to open other clinics addressing competition.[120] This factor also weighs in Plaintiffs' favor.

The last *Broz* factor asks whether the "fiduciary will . . . be placed in a position inimicable to h[er] duties to the corporation."[121] This conflict may materialize where the "fiduciary will be competing in some way with the entity [s]he serves or depriving it of an advantage."[122] Superficially, this factor cuts against Ramirez. She opened a clinic less than two miles away from CTS Pueblo and was providing the same services to a similar patient population. But the absence of any evidence in the record that patients were actually diverted and the indisputable evidence of the opioid addiction crisis gripping Pueblo suggest the lack of meaningful competitive risk from Elevate's nearby operation. Furthermore, Maric was operating beyond its capacity and mired in the "vicious spiral" precipitating more staff turnover,[123] and adversely impacting patient care.[124] Considering the unusual circumstances in which all of this arises—and as strange as it might seem at first blush—I conclude Ramirez did not place herself in a position inimicable to her duties. At best, this factor is a wash.

---

[120] *See* TT 47:22–48:4 (Ann Jamieson).

[121] *Broz*, 673 A.2d at 155.

[122] *Enhabit, Inc. v. Nautic Partners IX, L.P.*, 2024 WL 4929729, at *17 (Del. Ch. Dec. 2, 2024) (quotations omitted).

[123] TT 437:11–14 (Ramirez).

[124] TT 453:23–454:5 (Ramirez).

"Balancing the equities of [this] individual case,"[125] and with "all factors . . . taken into account,"[126] I give most weight to the plain lack of capacity to open a second clinic and the lack of meaningful competition. In these unusual circumstances, the other factors weigh less, and so I find that Plaintiffs did not prove usurpation. That said, this is arguably a close call given what would, in other circumstances, be plainly improper competitive behavior by a fiduciary. And so I also examine Plaintiffs' showing as to harm.

### b. Plaintiffs Have Failed to Show Harm or Wrongful Benefit

Even assuming breach, Plaintiffs fail to show harm, wrongful benefit, or a causal link to the breach entitling them to a "meaningful remedy."

The Court's powers "in fashioning equitable and monetary relief" are "very broad."[127] "The law does not require certainty in the award of damages where a wrong has been proven and injury established."[128] "]U]ncertainties in awarding damages are generally resolved against the wrongdoer,"[129] and "the scope of recovery for a breach of the duty of loyalty is not to be determined narrowly."[130] This does not, however, excuse a party's burden to show harm. Plaintiffs must show "that [they]

[125] *Sorrento Therapeutics, Inc.*, 2023 WL 5670689, at *26.

[126] *Id.*

[127] *Int'l Telecharge, Inc. v. Bomarko, Inc.*, 766 A.2d 437, 440 (Del. 2000).

[128] *Metro Storage Int'l LLC*, 275 A.3d at 859 (quotation omitted).

[129] *Id.* (quotation omitted).

[130] *Id.* (quotation omitted).

suffered harm or that the fiduciary wrongfully received a benefit."[131] Although the amount of damages can be an "estimate,"[132] the Court must have "a basis to make a responsible estimate."[133] Plaintiffs cannot recover for damages that are "uncertain, contingent, conjectural or speculative."[134]

Plaintiffs failed to prove Ramirez made any profits on Elevate. Instead, at least through the end of 2024, Elevate made no profits at all.[135] Indeed, by the time discovery closed, Elevate had suffered net losses of $388,817 between Q4 2022 and Q4 2024.[136]

Nor have Plaintiffs shown that a *single* patient left CTS for Elevate.[137] Yet, Maric argues for an award of more than $2 million against Ramirez. In support, Maric relies on what it says is lay expert testimony by Clark, Maric's CFO. But, even setting aside the parties' dust-up over whether Clark's testimony should be admitted at all, the substance of Clark's testimony was troubling for a host of reasons. To begin,

---

[131] *Id.* (citations omitted); *Agilent Techs., Inc. v. Kirkland*, 2010 WL 610725, at *27 (Del. Ch. Feb. 18, 2010) ("The loss suffered by the plaintiff, such as lost profits, is the usual indicator of damage; but, in cases where a specific injury to the plaintiff cannot be established, the defendant's actual gain may be considered.").

[132] *Siga Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1111 (Del. 2015), *as corrected* (Dec. 28, 2015) (citations omitted).

[133] *Del. Express Shuttle, Inc. v. Older*, 2002 WL 31458243, at *15 (Del. Ch. Oct. 23, 2002).

[134] *Sorrento Therapeutics, Inc.*, 2025 WL 2172268, at *8 (quotation omitted).

[135] JX 80 at 20 (Rubin Report) (citing to Elevate_000413, Def_000613).

[136] *Id.*

[137] TT 323:16–324:21, 326:20–327:1 (Clark).

23

the supplemental interrogatory response that Clark prepared and that Plaintiffs filed (late) in lieu of an expert report purported to present an analysis of damages in which Plaintiffs would be entitled to the entirety of Elevate's *revenues* through 2024—just over $2 million—without regard to whether Elevate actually turned a profit.[138] By the time of trial, Clark and Plaintiffs had abandoned that position and instead sought to focus the Court's attention on an alternative calculation applying Clark's estimate of "contribution margin" to revenue associated with each patient Clark said CTS lost to Elevate.[139] Clark's testimony about this change, and her process for coming up with and applying inputs to her analysis, was frankly about as clear as mud.

In addition, underlying Clark's damages analysis were assumptions that all of Elevate's revenues, and all of CTS's temporary patient census decline, were attributable to Elevate taking existing or potential CTS patients.[140] In other words, Clark did not account for the potential—which was plain from the evidentiary record—that individuals suffering from opioid addiction may have ceased seeking treatment, completed treatment, or moved; gone to the other non-Elevate clinic in Pueblo; or been simply turned away because CTS was bursting at the seams.[141] Clark simply assumed that every patient who stopped going to CTS for treatment

---

[138] JX 72 ("[A]ll revenue that Elevate is currently capturing, and will capture in the future, constitutes damages to Plaintiffs."); TT 321:3–15 (Clark).

[139] *See* TT 281:7–16 (Clark); Dkt. 146, Plaintiffs' Opening Brief. at 65–66; Dkt. 152 ("Post-Trial Oral Argument") 52:18–24.

[140] TT 322:3–19, 351:9–24 (Clark).

[141] TT 326:1–22, 328:4–329:1, 346:20–21, 347:1–5 (Clark).

went to Elevate.[142]  Yet, when asked whether there was any factual basis for that assumption Clark responded: "No, it was an assumption that we used."[143]  Clark further did not account for the potential—which was also plain from the record—that many Elevate patient came from locations well-outside of Pueblo.  Indeed, Clark was not aware that patients were kept on waiting lists at CTS Pueblo,[144] that Elevate bused patients from parts of southern Colorado outside Pueblo,[145]  or that there were other clinics within a 50-mile radius.[146]

Plaintiffs also offered little to no evidence or analysis of Elevate's actual financial performance.  Instead, Clark's analysis employed suspect assumptions and estimates derived from very limited data sets.  All in all, Clark's analysis was head-scratching.

---

[142] TT 328:22–329:2 (Clark).

[143] TT 328:22–329:2 (Clark); TT 356:12–18 (Clark) ("You never looked at CTS's patients and Elevate's patients from 2023 to 2024 to see if any of CTS's patients went to Elevate; correct? A. Correct. Q. So you have no idea if that assumption has any validity whatsoever; correct? A. Correct.").

[144] TT 346:20–21 (Clark).

[145] TT 331:19–21 (Clark).

[146] TT 326:5–327:10 (Clark).  It is worth noting the obvious:  Clark was not an independent third-party, but a senior employee of Maric.  TT 309:23–310:2 (Clark).  As such, it is impossible to ignore that she would have a significant interest in the outcome of this case.  In addition, despite being a senior employee of Maric and being offered as a lay witness, Clark testified that she had never been to CTS Pueblo, had no direct involvement with CTS clinics, and relied on information for her analysis from another Maric employee who was based in North Carolina and had no involvement with CTS clinics that Clark was aware of.  TT 301–302, 307:6–12, 330:20–331:12 (Clark).

In stark contrast, Ramirez timely identified and provided the report of Beth Rubin, a Senior Managing Director in Forensic and Litigation Consulting Practice at FTI Consulting, Inc. Rubin effectively demonstrated numerous flaws in Plaintiffs' damages case, including Clark and Plaintiffs' failure to engage in any meaningful causal analysis.[147] As Rubin aptly put it, Plaintiffs' analysis was based on "generalized and unsupported assumptions [that] use[d] flawed methodology . . . not tied to the facts . . . and, as a result, [ ] not calculated to a reasonable degree of certainty."[148]

Although the failure of Plaintiffs to proffer a damages expert is not dispositive,[149] it highlights the lack of persuasive, reliable evidence Plaintiffs presented and the absence of a "responsible estimate" here—particularly in a circumstance where Plaintiffs indicated they would provide a damages expert.

In any event, were the Court to find breach based on Plaintiffs' usurpation theory, Plaintiffs would be entitled to no more than a nominal award of $1 given the absence of evidence showing damages or a wrongfully retained benefit.[150]

---

[147] TT 650–677 (Rubin).

[148] TT 650:17–20 (Rubin).

[149] *See Empire Fin. Servs., Inc. v. Bank of New York (Delaware)*, 945 A.2d 1167 , 2008 WL 727036 at *2 (Del. 2008) (TABLE) (finding that even without an expert opinion on lost profits, "there was sufficient record evidence to support its damages claim").

[150] In addition to damages, Plaintiffs ask for imposition of a constructive trust on future profits and proceeds from any sale of Elevate. Having failed to prove usurpation, it follows that Plaintiffs are not entitled to a constructive trust. Even so, Plaintiffs' dubious approach to damages, or benefit to Ramirez, suggests a constructive trust would be antithetical to equity here.

26

## 2. Ramirez' Solicitation of Hollins

Plaintiffs argue that Ramirez breached her fiduciary duty by soliciting fifteen employees from CTS and seek more than $400,000 in damages. But Plaintiffs have only proven Ramirez' solicitation of Hollins.

"The fiduciary principle requires that a corporate director or officer, or the manager or officer of an LLC, act prudently, loyally, and in good faith to maximize the value of the entity over the long-term for the benefit of the holders of its undifferentiated equity."[151] A defendant's "disloyalty include[s] . . . solicitation of key [ ] employees for the company."[152]

While serving as Manager of CTS, Ramirez solicited Hollins, CTS Pueblo's program director, to work at Elevate. As the program director of CTS Pueblo, Hollins managed the day-to-day operations of the clinic as well as the staff, and thus was a key employee of CTS Pueblo.[153] As executive director and later regional director, Ramirez oversaw CTS' program directors and, it seems, worked closely with Hollins.

Elevate, via Ramirez, hired Hollins as its executive director towards the end of February 2023, before Elevate opened its doors to patients and while Ramirez was

---

[151] *Calumet Cap. Partners LLC v. Victory Park Cap. Advisors, LLC*, 2026 WL 246995, at *10 (Del. Ch. Jan. 29, 2026).

[152] *Enhabit, Inc.*, 2024 WL 4929729, at *21.

[153] TT 393:9–14 (Ramirez).

still Manager of CTS.[154] And yet, Ramirez testified that she did not inform Hollins that she owned Elevate and was seeking to hire an executive director.[155]

It was in this last respect that I found Ramirez' testimony lacking credibility. Ramirez could not credibly explain how Hollins knew to interview for the position at Elevate with Ramirez.[156] The position was not posted on any website, nor did Ramirez receive other applications for the position.[157] In addition, Ramirez interviewed Hollins before receiving her job application. That is an obviously strange chronology, unless there was some prior contact between Ramirez and Hollins regarding the position. Ultimately, I find Ramirez informed Hollins of Elevate's plans to open a clinic and induced Hollins to work there, all while Ramirez was serving as CTS' Manager and President. In doing so, Ramirez breached her duty of loyalty.

But, despite asking for more than $400,000 in additional damages, Plaintiffs failed to prove that Ramirez solicited any other employees. Perhaps Plaintiffs could have put forward a reasonable showing that Ramirez should be held responsible for indirectly soliciting staff. But, instead of putting forward reasonable analyses on which the Court can feel comfortable relying, Plaintiffs instead generated a list of all the staff who left CTS in 2023 and after subtracting for the average number of staff who left in the surrounding years, assumed that Ramirez was responsible for the

---

[154] TT 548:6–8 (Ramirez); JX 522, 522A.

[155] TT 584:3–5 (Ramirez).

[156] TT 444:10–445:5 (Ramirez).

[157] TT 583 (Ramirez).

rest.[158] This approach has fairly obvious potential flaws. For example, similar to Plaintiffs' total-patient-capture arguments, Plaintiffs did not check to see if all staff they identified even ended up at Elevate.[159]

Although I found her testimony as to Hollins' hiring lacking, I nonetheless found Ramirez' testimony credible in other regards—that Hollins, as the new executive director at Elevate, was responsible for and hired the remaining staff at Elevate.[160] And, if anything, the sparse evidence in the record shows that staff at CTS likely left CTS for independent reasons, including a deteriorating work environment and culture at CTS. As already explained, counselor caseloads had grown to 80 patients, well above the 55 or 60 targeted.[161] The clinic's average monthly patient census increased from 507 in 2021 to 680 in 2022.[162] Staff members were "overburdened" and searching for employment elsewhere.[163] CTS Pueblo was serving approximately 700 patients, outnumbering CTS' OTPs in Greeley and

---

[158] TT 286:21–287:2 (Clark).

[159] TT 359:14–17 (Clark) ("[Y]ou don't actually have any evidence that Ms. Ramirez poached any of Plaintiffs' employees, do you? A. Correct."); TT 360:3–7 ("Do you know for a fact that everybody on that list actually took a job at Elevate? A. I do not. Q. So you solely know that these are people that left CTS; correct?").

[160] TT 445:10–15, 446:5–8 (Ramirez).

[161] TT 66:16–21, 189:5–7 (Ann Jamieson); TT 453:4–8 (Ramirez).

[162] JX 72 at 4 (citing CTS_00006491, 96), JX 83.

[163] TT 437:8–14 (Ramirez).

Colorado Springs each.[164] If staff jumped ship, the record suggests it was because the CTS ship—which Ramirez was working to right—was already and independently sinking.

Plaintiffs' evidentiary presentation on solicitation was overall thin. But Plaintiffs have proven breach of fiduciary duty due to Ramirez' solicitation of Hollins.

For damages as to Hollins, Plaintiffs cite in passing to four entries for "Mileage Reimbursement" for Brewster, Hollin's replacement, in an Excel spreadsheet, totaling $1,627.59.[165] Plaintiffs also seek what they characterize as replacement costs for *Brewster's* replacement, Isabella Del Castillo. But, even setting aside questions of causation for this secondary or tertiary event, Plaintiffs provide no supporting documentation for Del Castillo's salary at Maric before she replaced Brewster, and her new salary as program director at CTS Pueblo. Given the meager record here, I conclude Plaintiffs are entitled to an award of $1,627.59, plus pre- and post-judgment interest.

### 3. Consulting Fees

Plaintiffs seek disgorgement of Ramirez' consulting fees in the amount of $290,000. Plaintiffs are hazy on the theory of their claim beyond asserting Ramirez violated the CTS employee handbook. But, even setting that aside, Plaintiffs failed

---

[164] JX 83; TT 441:7–9 (Ramirez).

[165] JX 70. Plaintiffs also seek an award of $5,000 for a relocation allowance but provide no supporting documentation for that figure. There also seems to be an entry for a $156.09 "Hotel Expense" for Brewster, but the briefing is unclear as to whether this is an actual out-of-pocket cost for which Plaintiffs are seeking reimbursement.

to show conflicts arising from her consulting services. Indeed, Plaintiffs gave the claim scant treatment, relying heavily on self-serving testimony by Ann Jamieson.

Plaintiffs have not shown that Ramirez' consulting activities were an actual or even potential conflict. Instead, the record points to the conclusion that Alan Jamieson was aware of Ramirez' consulting activities and agreed such consulting was to Maric's benefit.[166] Much of the consulting work came from SOTA, with which it seems from the record it was in Maric's interest to foster a strong relationship.[167] It is thus not surprising that Alan Jamieson was generally supportive of the work, at least based on the sparse record.[168] To protect herself against any uncertainty, it may have been wise for Ramirez to seek CTS' express consent, but based on the record, Maric implicitly authorized the consulting services that she was providing.

Plaintiffs also have not shown how the consulting work in any way interfered with Ramirez' duties or caused any harm to Maric. The clinics for which she provided consulting services were not in the proximity of any Maric OTP, and Plaintiffs have not shown that any patients were diverted from any Maric-entity to those clinics. Nor have Plaintiffs shown that the consulting interfered with Ramirez' ability to perform at CTS or NMTS. In fact, Ann Jamieson acknowledged that Ramirez was "an

---

[166] Alan Dep. 44:3–10.

[167] TT 399:15–21, 425:22–426:3 (Ramirez).

[168] TT 410:10–411:5, 412:7–10 (Ramirez).

excellent employee . . . very bright, very friendly[,] [e]verybody got along with her,"[169] and conceded that Ramirez never received a "poor performance review."[170]

For these reasons, I do not find Plaintiffs proved Ramirez' consulting breached her fiduciary duty.

### 4. Grant Non-Renewal

Plaintiffs argue that Ramirez breached her fiduciary duties by failing to renew a $518,000 grant from the University of Colorado Denver.[171] Plaintiffs ask for the full amount. But Ramirez discussed the non-renewal with other staff at CTS and concluded that the reporting obligations under the grant had become too burdensome.[172] Indeed, CTS did not re-apply for the grant when the next application period opened, after Ramirez' departure.[173] Plaintiffs thus have not shown that Ramirez breached any fiduciary duty by deciding not to renew the grant.

### B. Remaining Counts

Plaintiffs devoted scant briefing to their remaining claims. These are Plaintiffs' claims for conversion (Count II), intentional interference with existing contractual

---

[169] TT 18:14–16 (Ann Jamieson).

[170] TT 37:1 (Ann Jamieson).

[171] JX 506; Post-Trial Oral Argument 35–36.

[172] *See, e.g.*, Tearman Dep. 15:23–16:5 ("Q. Was that a decision of the team? A. We would not be making the decision, but we would be giving feedback. And our feedback was -- myself and the other program manager, was that we did not want to continue to move forward with that because of the difficulty. Q. So and who were you giving your feedback to? A. Perla.").

[173] TT 364:4–8, 368:5–9 (Clark).

relationships and prospective business advantage (Count III), and misappropriation of trade secrets (Count IV).[174]

Plaintiffs fail to prove their trade secrets and conversion claims.[175] Plaintiffs identify Maric's policies, procedures, and forms as the basis for their claims. But they have not shown how these documents contained proprietary information or were confidential. Instead, Plaintiffs make conclusory statements and rely on self-serving testimony of Ann Jamieson that all Plaintiffs' forms were "property" and constituted "trade secrets." [176] For example, Plaintiffs assert that the documents "had independent economic value" because it "took [Maric] years to develop those."[177] But the testimony skirts the question of whether the information contained proprietary

---

[174] Given their minimal treatment, the Court asked Plaintiffs at post-trial argument to provide in detail the arguments for the remaining counts, and if not, whether the Court should deem the counts waived and focus attention on the fiduciary duty claim. Plaintiffs responded, "[y]ou don't have it wrong . . . we've probably spent more time discussing this here today that I would have expected . . . in a post-trial opinion." Post-Trial Oral Argument 27:7–19. I thus give the remaining claims proportionate treatment.

[175] *See* 6 *Del. C.* § 2001(4) (defining a "trade secret" as: "[I]nformation, including a formula, pattern, compilation, program, device, method, technique or process, that: a. [d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and b. [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy."); *Gould v. Gould*, 2012 WL 3291850, at *7 (Del. Ch. Aug. 14, 2012) (internal quotation marks omitted) ("In order to prove conversion, a plaintiff must show that: (1) it had a property interest in equipment or other property; (2) it had a right to possession of the property; and (3) the property was converted.").

[176] TT 198:10–199:2 (Ann Jamieson) ("Q. Did you testify that none of them are marked as confidential on the document, electronically or physically? A. That's correct. Q. And do you ever tell your employees which documents are confidential and which ones are not? A. They're instructed to not share any proprietary information at all. Q. Okay. But -- A. It's in the employee manual. Q. Okay. But what is proprietary, though? A. Things that we produced.").

[177] TT 28:9–10 (Ann Jamieson).

information. Plaintiffs do not walk through the documents or identify what, if any, proprietary or confidential information they contained. And, in contradictory fashion, Ann Jamieson goes on to testify that the forms were not even confidential.[178] Ramirez, for her part, testified that the forms and information were variously available through government and other sources on the internet. [179] The forms were also available in the clinic's hallway where all staff could access them, and they could be obtained by patients upon request.[180] In these circumstances, I conclude Plaintiffs have not proven their claims for conversion or trade secrets.

Finally, Plaintiffs' claim that Ramirez tortiously interfered with CTS' patients and business opportunities based on the "guest dose" incident and asserted diversion of patients to Elevate. Ultimately, I find that Plaintiffs failed to prove this claim for the same reasons Plaintiffs have failed to prove that Ramirez actually competed with Maric in opening Elevate. On reply, Plaintiffs also briefly reference interference with staffing at CTS, but Plaintiffs did not raise this in the argument section of their opening brief. I therefore deem the argument waived.

---

[178] TT 199:3–11 (Ann Jamieson) ("Q. Okay. But all proprietary information is not confidential; is that right? A. None of them are confidential, but they are proprietary. And we don't allow people to share it. Q. Understood. But as far as the documents, the policies, procedures and forms, I understand that they're proprietary, but they are not confidential; is that right? A. They can't be confidential. We have to share them with the state, with all of our employees, with CARF. Q. Understood. And I do understand that there is confidentiality training, but I understood that that was HIPAA training; is that right? A. So, yeah. Confidentiality – the confidentiality federal law and the HIPAA law we train, but none of our materials are actually confidential. I mean -- Q. Understood. A. They're just proprietary.").

[179] TT 418:13–22 (Ramirez).

[180] TT 419:9–16 (Ramirez).

## C.    Legal Fees

Plaintiffs seek an award of their legal fees, which as of post-trial argument, ran up to $1.258 million.   Under the American Rule, each party bears its own attorneys' fees.[181]  Exceptions to this rule include situations where the parties agree by contract to award fees to the prevailing party, or for "bad faith" misconduct during the litigation.[182]  In other instances, the Court has exercised its "broad discretionary power to fashion equitable relief" to award attorneys' fees "where there has been a breach of the duty of loyalty" and it "would be unfair and inequitable" for the plaintiffs to be saddled with attorney's fees.[183]

Here, Plaintiffs identify no contractual fee-shifting provision and point to no bad faith litigation conduct by Ramirez.   Instead, they assert a policy need to discourage future acts of disloyalty.   But a fee-shifting award is not proper here. Although Ramirez breached her duty of loyalty by soliciting Hollins, this was a narrow, if not hollow, victory.  Plaintiffs did not prevail on any of their other claims. Furthermore, although Plaintiffs represented that they intended to produce a damages expert to prove their claims, they never did, proceeded to blow past discovery deadlines in the lead-up to trial, and advanced a slew of wobbly damages theories and evidence at trial.   If anything, I am left with the impression that

---

[181] *Goldenberg v. Immunomedics, Inc.*, 2021 WL 1529806, at *19 (Del. Ch. Apr. 19, 2021).

[182] *Rice v. Herrigan-Ferro*, 2004 WL 1587563, at *1 (Del. Ch. July 12, 2004).

[183] *William Penn P'ship v. Saliba*, 13 A.3d 749, 758 (Del. 2011).

35

Plaintiffs did not expect or really intend to go to trial and then scrambled once it became clear that Ramirez would demand her day in court. Chancery litigation is not an inexpensive endeavor, particularly when expert testimony is involved. Plaintiffs imposed significant financial, and frankly, emotional costs on Ramirez. Considering the circumstances I have described in this decision, I conclude Plaintiffs' request for fees must be denied.

## III.    CONCLUSION

For the foregoing reasons, I will enter judgment in Plaintiffs' favor on their breach of fiduciary duty claim consistent with this decision and in Ramirez' favor on Plaintiffs' remaining claims. The parties are to confer on and file a proposed order implementing this decision, along with a joint letter advising the Court of any issues that may remain to be addressed, within ten business days.